In re Brett PEEL, Debtor.

Brett Peel, Plaintiff,

v.

SallieMae Servicing–Heal Loan, Sallie-Mae Servicing–Smart Loan, and Educational Credit Management Corp., Defendants.

Bankruptcy No. 97–50524–ASW.
Adversary No. 97–5396.

United States Bankruptcy Court,
N.D. California,
San Jose Division.

Sept. 30, 1999.

Heinz Binder, Bethany Marshall, Binder & Malter, San Jose, for Plaintiff.

Miriam E. Hiser, San Francisco, for Defendant.

## *MEMORANDUM DECISION*

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

### *I. BACKGROUND*

In this adversary proceeding, Plaintiff Brett Peel ("Debtor"), a Chapter 7 debtor, seeks to discharge a consolidated student

loan pursuant to Section 523(a)(8) of the Bankruptcy Code.[1] Defendant Educational Credit Management Corp. ("ECMC"), holder of the consolidated promissory note and real party in interest, was substituted as defendant on March 12, 1998.

As originally filed, this adversary proceeding was to determine the dischargeability of two loans: a Health Education Assistance Loan ("HEAL loan") held by SallieMae and a SMART LOAN held by ECMC. Debtor failed to meet the test of 42 U.S.C. § 292f(g), which governs the discharge of HEAL loans in bankruptcy, and the Court ruled prior to trial that Debtor's Heal Loan obligation to Defendant Sallie-Mae is non-dischargeable.[2] The only remaining claim was for discharge of the SMART LOAN obligation.

On June 16, 1999, this matter came before the Court for trial in San Jose, California. Heinz Binder, Esq. and Bethany N. Marshall, Esq. of the law firm of Binder & Malter represented Debtor and Miriam Hiser, Esq. represented ECMC. Debtor was the only witness called by the parties at the trial, submitting to direct and cross examination. The following represents the Court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr.P. 7052.

## II. Facts

Debtor is thirty-three years old, single and has no children. He is in good health with no physical or mental impairments that affect his ability to earn a living. Debtor began his higher education by attending Mission Junior College and its sister school West Valley Junior College. He focused on a "pre-med" curriculum with the aim of going on to chiropractic college. To support himself, Debtor worked part time while attending classes. Debtor earned an Associate of Science degree.

In 1989, Debtor enrolled in Palmer Chiropractic College. It was at this time that Debtor began accumulating student loans. By taking classes during the summer in addition to the fall and spring, Debtor graduated with a Doctor of Chiropractic degree in three years instead of the standard four. After graduation in December 1991, Debtor began searching for employment as a full time chiropractor. Debtor's student loans became due and payable on his graduation or, subject to deferments, shortly thereafter. As Debtor was unemployed immediately after graduation, he applied for forbearances on his loans and the same were granted by the lenders.

It was not until April 1992 that Debtor secured any employment in his new field. He was offered a position in the office of Alan Jacobsen, Chiropractor, whose office was located in Carmichael, California. Debtor relocated to Carmichael, incurring expenses in the move. During Debtor's tenure with Dr. Jacobsen, his Adjusted Gross Income ("AGI") was $1,600 per month. Debtor testified that his income was insufficient to meet his expenses during this period let alone make payments on his student loans; he borrowed money from his mother to pay for the deficit. These circumstances continued until Dr. Jacobsen sold the practice in late 1993, at which time Debtor was terminated. Debtor had received a raise toward the end of his employment that increased his AGI to $2,000 per month, and he had begun making loan payments but discontinued them when he was terminated. He continued diligently to apply for forbearances, making payments during the application periods before the new forbearances were granted.

---

1. Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

2. Judgment was entered on April 19, 1999 in favor of SallieMae Servicing on the HEAL loan. As of trial in June 1999 regarding ECMC's SMART LOAN, the amount of the non-dischargeable HEAL loan was over $31,-000.

In late 1993, after sending out resumes to clinics in the Sacramento area, Debtor found work as a commission-only independent contractor, splitting his time between two offices. Debtor continued in this capacity throughout 1994. His AGI for the entire year was only $3,403. Debtor testified that he worked forty-hour weeks but, as an independent contractor, he was only paid for those procedures done on his own patients. The remainder of his time was spent attempting to bring in new patients, so as to increase his future income. Debtor testified that factors which contributed to his inability to build a practice were the high numbers of practicing chiropractors at that time and the shift by insurance companies toward Preferred Provider Organizations ("PPOs") and Health Maintenance Organizations ("HMOs"), with the corresponding lack of coverage for chiropractic services in these plans. During 1994, Debtor made no payments on his student loans, borrowed heavily from his mother to meet expenses, and continued to receive forbearances.

In February 1995, with no additional forbearances available on the original loans, Debtor consolidated his student loans into the HEAL loan and the SMART LOAN, which are at issue in this adversary proceeding. In exchange for further forbearances, Debtor agreed to a thirty year term with an interest rate of nine percent (9%) on the SallieMae SMART LOAN. He continued to work as an independent contractor throughout 1995 earning an AGI for the year of only $6,113. In September 1995, Debtor made two payments on the consolidated SMART LOAN while waiting for the next forbearance, a total of $576.00. Debtor testified that he borrowed from his mother to make these payments.

Leaving the chiropractic business, Debtor moved back into his mother's house in Santa Clara, California in 1996. He attempted to start a medical billing business from home and maintained a part-time job doing promotions for a soft drink company.

His efforts failed. Debtor's AGI for the year 1996 was $2,294, and he was unable to make payments on his loans. Debtor filed for bankruptcy under Chapter 7 on January 22, 1997, and discharge was granted April 25, 1997.

In his Chapter 7 petition, Debtor listed his income as $500 per month as a self-employed consultant and his expenses as follows:

| | |
|---|---|
| Telephone | $ 60.00 |
| Home Maintenance | $ 30.00 |
| Food | $150.00 |
| Clothing | $ 20.00 |
| Laundry and Dry Cleaning | $ 5.00 |
| Transportation | $120.00 |
| Recreation, et al. | $ 30.00 |
| Charitable Contributions | $ 5.00 |
| Other (Seminars, bus expenses) | $ 85.00 |
| **Total Expenses** | $505.00 |

At trial, these expenses were not directly challenged by ECMC. However, comparisons were made between these expenses and those later provided by Debtor under changed circumstances.

In March 1997, Debtor began working for Medical Business Automation Inc. ("MBA") as a technical support representative and was still working there at the time of trial. His function is to answer customer questions regarding the software MBA distributes. Debtor had no formal training in computers and qualified for his position based on his experience with similar software gained in the course of his failed medical billing business. Debtor had an AGI of $25,675 for all of 1997. Upon obtaining his job with MBA, Debtor began paying rent to his mother of six hundred dollars ($600) per month. In addition to the rent payment, Debtor had expenses for food, gas, insurance, auto repairs, utilities, clothing, and others which consumed the balance of his net income. He made no payments on his student loans. Debtor filed the complaint in this Adversary Proceeding on August 8, 1997.

Debtor's evidence includes a list of his current (August 1998) living expenses, as follows:

| | | |
|---|---|---:|
| Rent | $ | 750.00 |
| Food | $ | 300.00 |
| Clothes and Shoes | $ | 30.00 |
| Laundry and Supplies | $ | 40.00 |
| Telephone | $ | 40.00 |
| Medical Insurance | $ | 42.00 |
| Medical Expenses | $ | 10.00 |
| Automobile Insurance | $ | 81.56 |
| Automobile Maintenance | $ | 200.00 |
| Automobile Gas and Fluids | $ | 130.00 |
| Entertainment | $ | 60.00 |
| Personal Items | $ | 40.00 |
| Household Items | $ | 40.00 |
| Household Repairs | $ | 20.00 |
| Haircut | $ | 15.00 |
| DMV Auto Fees (license/registration) | $ | 10.00 |
| Payment to Mother for 1st/ last Rent | $ | 50.00 |
| Reserve/Unplanned Expenses | $ | 100.00 |

**Total Expenses**          $1,958.56

Debtor lives in a basement apartment with one bedroom and a living room. It has no kitchen and no laundry facilities. Debtor receives reduced rent in exchange for making repairs. Debtor testified that he has searched in the past and continues to search for other lodgings but that, even with a roommate, he would have to pay more. Debtor's testimony was highly credible on this issue.

Debtor also introduced into evidence an updated list of expenses with the explanation that the original list was based on approximately one month of independent living since Debtor moved out of his mother's house. Many expenses, such as rent ($750.00), auto insurance ($81.56), auto gas and fluids ($130.00), auto registration ($10.00) and repayment to mother for first and last month's rent ($50.00) remain the same. Other expenses increased: food ($375.00, up $75.00), laundry ($50.00, up $10.00), telephone ($45.00, up $5.00), medical expenses ($47.00, up $37.00), auto maintenance ($250.00, up $50.00), and household repairs ($25.00, up $5.00). Debtor decreased his expenses for clothing ($10.00, down $20.00) and for unplanned expenses ($50.00, down $50.00). Debtor also eliminated expenses for entertainment, haircuts and, by way of a stipulation, his medical insurance expense ($42.00), which was included in error. Debtor's expenses are approximately $1,953.56 per month. It should be noted that this amount does not include monies borrowed from Debtor's mother for attorney's fees to prosecute this action nor does it include the substantial monthly payment which will be due on the non-dischargeable HEAL loan.

Many of these expenses were not challenged by ECMC. Those that were challenged, or otherwise scrutinized, are discussed in the section entitled "Analysis."

### III.  Applicable Law

A debtor cannot be discharged from a government guaranteed student loan unless either: 1) seven years have passed from the due date of the first payment on the loan to the date the debtor's bankruptcy is filed or 2) the debtor can demonstrate that failure to discharge the debt "will impose an undue hardship on the debtor and the debtor's dependents.", 11 U.S.C. § 523(a)(8).[3]  In this case, the parties have stipulated that less than seven years have elapsed between the due date of Debtor's first student loan payment and the date Debtor filed bankruptcy. Debtor therefore seeks relief solely under the undue hardship exception.

"Undue Hardship" is not defined in the Bankruptcy Code, the legislative history, or case law. However, the courts have developed tests to determine when "undue hardship" exists. The Ninth Circuit recently adopted one such test from *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2nd Cir.1987)("*Brunner*"): *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir.1998) ("*Pena*").

---

**3.** Section 523(a)(8) has been amended to eliminate the seven year repayment exclusion. Higher Education Amendments of 1998, Pub.L. No. 105–244, 112 Stat. 1581, 1837.

The amendment only applies to bankruptcies filed on or after October 7, 1998 and therefore does not affect this case.

■ *Brunner* and *Pena* propound a three part test to determine whether undue hardship would result from the debt being non-dischargeable. The debtor has the burden of proving each element. The debtor must show that: (1) he "cannot maintain based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396 *cited in Pena*, 155 F.3d at 1111; (2) "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Id.;* and (3) "the debtor has made good faith efforts to repay the loans." *Id.*

The Ninth Circuit Bankruptcy Appellate Panel ("BAP") has recently ruled that a partial discharge of a student loan debt is not permissible under Section 523(a)(8) and the trial court must hold that the entire loan is either dischargeable or non-dischargeable. The BAP in *United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747 (9th Cir. BAP 1998) ("*Taylor*") opined that the plain language of Section 523(a)(8) precludes partial discharge of a student loan. The BAP "noted that Congress included the phrase, 'to the extent,' in three other subdivisions of the dischargeability statute, § 523(a)(2), (a)(5), and (a)(7)." *Id.* at 753. Such language serves as a qualifier in the subdivisions excepting some part of the debt from discharge if certain circumstances are met, but "to the extent" is not used in Section 523(a)(8). "Furthermore, where Congress has failed to include language in statutes, it is presumed to be intentional when the phrase is used elsewhere in the Code." *Id.*

## IV. Analysis

### A. Current Minimal Standard of Living

■ This Court must first calculate Debtor's current income and expenses to determine whether he can maintain a minimal standard of living if required to repay his SMART loan. This determination is left to the discretion of the bankruptcy court. *Pena* at 1112.

Debtor testified and the parties stipulated that, as of the date of trial, he has an AGI of $3,000 per month ($36,000 per year). After subtracting taxes, pre-tax health insurance premiums ($42.00) and payments to his 401(k) ($400 per month), Debtor has a net income of $1,885 per month. ECMC questions the monthly pre-tax contributions to Debtor's company-sponsored 401(k) plan. At this time, this is the Debtor's only vehicle for saving money. He has no savings accounts. He does have a separate Individual Retirement Account("IRA") with a current balance of approximately $1,700 which he received as a gift from his parents on his sixteenth birthday (he has made no contributions to it himself).

■ Debtor has been contributing to his 401(k) since he became eligible three months after beginning his employment with MBA.[4] There is no authority binding on this Court which holds that a debtor may never make any contribution to a 401(k) plan and still qualify for a hardship discharge. The vast majority of cases this Court has found deal with the question of whether a Chapter 13 plan which provides for 401(k) contributions is confirmable. Most courts have engaged in a case by case analysis: *In re Powers*, 202 B.R. 618, 620 (9th Cir. BAP 1996)(allowed contribution when calculating whether to increase Chapter 13 plan payments); *In re Williams*, 233 B.R. 423, 429 (Bankr. W.D.Mo.1999) (speaks of reducing but not eliminating contribution to make small payments on student loan debt); *In re Brown*, 227 B.R. 540, 543 (Bkrtcy.S.D.Cal. 1998) (did not allow contribution because debtor had begun contributions three months before trial and was already qualified to collect a military pension). This

4. Debtor currently has approximately $8,000 in his 401(k). He testified that he may use that money to pay a portion of the HEAL loan.

Court would not favor a rule that debtors attempting to discharge debts alleged to be unduly burdensome may never put any money aside for retirement. To do so would merely shift the burden on the taxpayer from the national level, by discharging the government guaranteed-student loan, to the local level if insufficient funds at retirement were to necessitate resort to welfare. Nearly everyone should save some money for old age and retirement. The Court is of the view that the line of cases allowing judicial discretion to permit some contribution is the better reasoned.

In the instant case, Debtor is thirty-three years old and has many years left in which to save for his retirement. On the other hand, he will likely have to repay the Heal loan over many years. Although Debtor certainly needs to save some money for his retirement, the 401(k) payroll deduction of $400.00 will be added back into Debtor's gross income figure merely for the purpose of conducting an initial analysis. However, the whole $400.00 cannot be applied, as the payroll deduction occurs pre-tax. Debtor testified and ECMC raised no objection to an after-tax figure for the 401(k) contribution of approximately $260 per month. Adding this to the previous net income figure equals $2,145.00. The Court will use this figure in its analysis.

The Court then examines the Debtor's monthly expenses. At trial, Debtor introduced into evidence a list of expenses totaling $1,953.56. But the Court must also factor in the non-dischargeable HEAL loan payment. The parties stipulated to a payment amount of $290.00 per month.[5] Adding this to Debtor's expenses raises the dollar amount to $2,243.56. This figure is already greater than Debtor's monthly net income.

■ ECMC questioned the difference between Debtor's current expense for food ($375.00) and that listed on his prior decla-ration filed in August 1998 ($300.00). Debtor explained his relatively high food costs by the fact that his apartment is not equipped with a kitchen. Therefore, his ability to cook for himself is limited to frozen pre-packaged foods which he can prepare in the microwave. The balance of Debtor's meals are eaten out or carried back in. Debtor additionally testified that he had only moved out of his mother's house the month before filing the August declaration and that it was based on his limited experience of living independently at that time. Considering Debtor's housing situation and the corresponding low rent ($750.00 per month), the Court does not find this expense unreasonable. It does not exceed a minimum standard of living.

■ Debtor, in his testimony, elaborated on the reasons for other increases in expenses, specifically the automobile maintenance costs and the difference in Debtor's Schedule "J" expenses as compared to his current expenses. Debtor testified that his car is a 1992 Chrysler LeBaron with 108,000 miles on the odometer. The car's convertible top has several long tears in it, the rear window is broken, and the suspension is deteriorating. Debtor further testified that, in the prior month, he paid $300.00 to fix an oil leak. Taking into account the age and condition of Debtor's automobile, the Court does not find Debtor's estimated expenses of $250.00 unreasonable. The Court also notes that Debtor has made no provision in his expenses for the potential failure of this automobile and the subsequent need to purchase another.

Debtor also explained the rather significant increase in his expenses from those filed in his Schedule "J" of the Chapter 7 bankruptcy ($505.00 total). Debtor testified that at the time of filing, he was living rent-free in his mother's house. According to the Schedule, his expenses mainly consisted of food ($150.00), transportation ($120.00), and seminar and bus expenses categorized under "other" ($85.00). He

---

5. The parties use a value of $31,000; a loan term of fifteen years which began when the loan was consolidated in 1995; and an interest rate of 8%.

testified that his mother paid the utilities and for much of the food, and that he was borrowing money from her to meet his own expenses.

Were the analysis to end here, the Debtor's Income would be $2,145.00 and his expenses would be $2,243.56. The parties further stipulated that a hypothetical payment due under this SMART LOAN, assuming that it too were determined to be non-dischargeable, would be $635.00 per month.[6] This further raises the expenses figure to $2,878.56: over seven hundred dollars more than Debtor's monthly net income. Even without the SMART loan factored in, Debtor has no disposable income. All of Debtor's expenses are reasonable, providing a very modest lifestyle. Some of Debtor's budgeted expenses are extremely low. For example, Debtor has only budgeted ten dollars per month for clothing and shoes, although he has to dress appropriately for work every day. He will need more money for that category of expenses than he has projected to maintain even a minimal standard of living. Because Debtor is barely able to meet his expenses now and because his expenses are very modest, the Court finds that Debtor has met the first prong of the *Brunner* test.

### B. Additional Continuing Circumstances

■ The second prong of the *Brunner* test requires the Debtor to demonstrate "additional circumstances exist that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan." *Brunner* at 756. Several factors in the Debtor's circumstances indicate to the Court that his financial straits are likely to continue for some time. "[A]s part of the second prong analysis, the value of [Debtor's] education is relevant to his future ability to pay off

the student loans." *Pena* at 1114. Debtor tried diligently but could not make ends meet as a chiropractor, so that field appears not to be a realistic option for him in the future. Moreover, Debtor no longer has a chiropractor license to practice in California because he cannot afford to pay for the licensing requirements in his current financial situation. Without a license, the degree is, for all practical purposes, useless. In addition, Debtor testified that the chiropractic degree is not transferable to any other profession and that other professional schools would not accept the academic credits earned in its pursuit. This is not to say that Debtor has received no benefit from his education, but does show that it has no direct practical value outside of the narrow field.

Turning to Debtor's future earning potential, the Court notes that Debtor has worked for MBA since March 1997. Debtor described his duties as providing technical support over the phone for the software products that MBA creates and distributes. Debtor testified that his position has limited growth potential and that he has received no promotions and only one raise since beginning work there. He further testified that his employer expects him to put in overtime for which he is not compensated. As noted above, Debtor received an Associate of Science degree from Mission Junior College before obtaining his chiropractic degree. Debtor testified that his course load there had a pre-med focus and did not include any computer classes. For Debtor to improve his situation in the computer industry, he will require additional education or training. Debtor testified that he is attempting to take additional junior college courses and "self-teach" himself on the Internet. The computer industry is highly competitive and level of education is often a significant

---

6. This figure is based on paying off the balance of $62,921.89 over fifteen years (from 1995) at 9% interest. Defendant later stated that this is a thirty year loan but did not provide an adjustment for the $635 per month figure. However, as noted above, even if the monthly payments were reduced to approximately $300, or even less, Debtor would have no disposable income from which to pay this loan.

factor in hiring.[7] The Court will not assume that the Debtor would be likely, or able, to incur additional student loan debt to obtain new skills in order to pay off his existing loans, nor did ECMC contend that Debtor would be likely to be able to obtain such funding.

Another circumstance affecting Debtor is his having to repay his non-dischargeable HEAL loan. That obligation was a fifteen year note entered into in 1995. There are eleven years remaining under that commitment unless the Debtor and that lender reach a different agreement.[8] Debtor has not been able to pay regularly on the HEAL loan for the last four years, so he is now about four years behind on his payments, plus whatever interest has accrued. Debtor also has post-bankruptcy debts to his mother for attorney's fees totaling $6,900.00 at time of trial. Some $40,000 in additional unsecured debt to Debtor's mother was discharged in his Chapter 7 bankruptcy, and Debtor has no legal obligation to repay those monies.

For all the above reasons, this Court determines that Debtor's financial situation is likely to continue for all or at least a significant portion of the repayment period of this loan. Defendant offered no evidence that Debtor has any better options open to him to refute Debtor's testimony regarding the same. The Court therefore finds that Debtor has satisfied the second part of the *Brunner* test.

### C. Good Faith

ECMC maintains that Debtor cannot meet the good faith requirement of the *Brunner* test because he only made two payments on its consolidated loan. The good faith standard under *Brunner* requires that a debtor must either make an effort to repay the loans or show "that the forces preventing repayment are truly

beyond his or her reasonable control." *Brunner* at 755. Furthermore, "[s]ince a debtor's good faith is interpreted in light of his ability to pay, a complete failure to make even minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the ability to make payments." *In re Lebovits,* 223 B.R. 265, 275 (Bankr.E.D.N.Y.1998); *In re Rose,* 215 B.R. 755, 765–66 (Bankr. W.D.Mo.1997); *In re Clevenger,* 212 B.R. 139, 146 (Bankr.W.D.Mo.1997); *In re Rosen,* 179 B.R. 935, 941 (Bankr.Or.1995).

In the present case, Debtor testified that he obtained the allowed forbearances upon graduation or as the loans became due. He further testified that he made some payments while awaiting subsequent forbearances, both prior to loan consolidation as well as after. Debtor also stated that he had begun making regular payments in 1993 after receiving a raise at his first chiropractic job. He ended the payments only after he was terminated. When Debtor could no longer obtain forbearances on his original loans, he consolidated them in 1995 into the two loans originally at issue in this adversary proceeding. Debtor testified that his reason for consolidating the loans and accepting a higher rate of interest was to obtain more forbearances so as not to default on his loans. Debtor testified, and ECMC concurs, that Debtor made two interest-only payments on his consolidated loan in September 1995, which monies were borrowed from Debtor's mother. When no more forbearances were available on Debtor's loans and his situation had not improved such that he could make payments (in fact it had deteriorated significantly), Debtor filed for Chapter 7 bankruptcy.

The fact that Debtor obtained forbearances and regularly and carefully made payments while his applications for for-

---

**7.** Debtor testified that he found a Bachelor Degree to be an absolute minimum requirement to obtaining employment which pays a decent salary.

**8.** Debtor testified that he has been unable to come to an agreement with SallieMae regarding the HEAL loan. The lender has refused to discuss the matter until the outcome of this case is known.

bearances were under consideration distinguishes this case from the facts of *Brunner*. The debtor in *Brunner* "filed for discharge within a month of the date for the first payment on her loans came due, . . . . made virtually no attempt to repay, [and never] requested a deferment of payment, a remedy available to those unable to pay because of prolonged unemployment." *Pena* at 1114 *citing Brunner* at 758.

In this case, Debtor was scrupulously diligent and attentive with respect to his student loans. He made payments when his circumstances permitted, borrowed money to make payments between forbearances even when his circumstances were dire, and applied for and was granted forbearances when he could not pay. Debtor was very careful to take whatever measures were necessary to prevent his loans from going into default. As a result, there is no evidence before this Court that any of his student loans (including the ECMC SMART LOAN) was ever in default. For all of these reasons, the Court finds that Debtor made a good faith effort to repay his ECMC student loan and therefore has met the third prong of the *Brunner* test.

### D. Discharge in Part or Discharge in Whole

■ ECMC argued that, assuming undue hardship was found in this case, only a partial discharge for its loan should be granted, pointing out that the Debtor thereby would be relieved of what could potentially be a lifelong burden and the lender would see some return of its investment. However, the Ninth Circuit BAP has recently ruled in *Taylor* that a partial discharge is not permissible under Section 523(a)(8). As stated above, the BAP ruled that the failure to include the phrase "to the extent" in 523(a)(8) when it does appear in other subsections of Section 523 precluded a bankruptcy court from granting a partial discharge.

While some other Courts have reached the opposite conclusion in interpreting Section 523(a)(8), none of those decisions is binding on this Court. The Ninth Circuit BAP characterized these cases as follows: "[T]hese bankruptcy courts have either found § 523(a)(8) to be ambiguous, . . . . or have relied on equitable principles." see *Taylor* at 753 n. 12. The BAP found the language of Section 523(a)(8) "to be clear and unambiguous." *Id.* at 754. The BAP also found that "Section 105(a) [governing equity powers] cannot be used to circumvent the clear and unambiguous language of § 523(a)(8)." *Id.* This Court does not reach the question of whether it is bound by decisions of the BAP, but chooses to follow *Taylor* in this case.

■ Regardless of the issue decided in *Taylor*, this Court would grant a total discharge in this case. Unlike those cases in which the debtors had enough disposable income to make partial payments on their loans, (see *In re Brown*, 227 B.R. 540 (Bankr.S.D.Cal.1998) and *Matter of Rivers*, 213 B.R. 616 (Bankr.S.D.Ga.1997)), this case presents a situation where Debtor has *no* disposable income even before the SMART loan is factored into the equation. And while the Debtor and SallieMae may come to an agreement regarding a payment schedule for the HEAL loan, such an agreement will likely consume any disposable income that is or becomes available. Debtor's obligation to ECMC is $62,921.89 now and would be significantly increased by the accrual of interest even if ECMC were to agree voluntarily to wait until the HEAL loan is satisfied to begin receiving payments on its loan. The Court has no evidence that ECMC would agree to such a deferral in any event (*see* p. 395 n. 8). The Debtor will not likely have any disposable income during the duration of the ECMC loan. Debtor cannot repay the ECMC loan and maintain a minimum standard of living.

### V. Conclusion

For the foregoing reasons, Debtor's obligation to Educational Credit Management

Corp. will be discharged in full pursuant to 11 U.S.C. § 523(a)(8). Failure to do so would place an undue hardship on Debtor for the present duration of the student loan and much longer. Debtor has no ability to repay this loan. Counsel for Debtor is directed to prepare a form of order and submit it to the Court after having presented it for review as to form and substance upon counsel for ECMC.