In re Jeremiah M. BROWN and Catherine C. Brown, Debtors.

Great Lakes Higher Education Corporation and Hemar Insurance Corporation of America, Appellants,

v.

Jeremiah M. Brown and Catherine C. Brown, Appellees.

No. 98–2329–IEG.

United States District Court, S.D. California, San Diego Division.

July 29, 1999.

Jeremiah Brown, Oceanside, CA, for Plaintiffs.

Mathew Dew, Dew & Blaney, Madison, WI, Martin T. McGuinn, Hinchy, Witte, Wood Anderson & Hodges, San Diego, CA, for Great Lakes Higher Educ. Corp.

Melissa Blackburn, Mulvaney, Kahan & Barry, San Diego, CA, for Hemar Insurance Corp. of America.

ORDER AFFIRMING IN PART AND REVERSING IN PART THE BANKRUPTCY COURT'S JUDGMENT; REMANDING CASE

GONZALEZ, District Judge.

Appellants Hemar Insurance Corporation of America ("Hemar") and Great Lakes Higher Education Corporation ("Great Lakes") seek reversal of the bankruptcy court's December 9, 1998 judgment discharging appellees John M. and Catherine C. Brown's (the "Browns") student loans pursuant to 11 U.S.C. § 523(a)(8).

## BACKGROUND [1]

Mr. Brown is currently serving in the United States Marine Corps, where he has served for more than twenty years. Mrs. Brown is not employed. They have two children together, and Mr. Brown has a son from a prior relationship who lives with his mother in Oregon.

In 1992, Mr. Brown received a Bachelor of Science degree in financial management from Park College, which he attended on a part-time basis while in the Marines. In 1993, he enrolled in law school in the University of San Diego's full-time evening program. Mr. Brown did not complete his first year of studies because his military commitments caused him to be deployed without advance notice. However, because of his circumstances, the University of San Diego allowed him to return the following year. Over the next three years, Mr. Brown was able to complete two years of his curriculum, after which the school academically disenrolled him.

While at school, Mr. Brown received student loans, which now total $96,628.08, in order to help pay for his law school tuition and expenses. Several months after Mr. Brown's disenrollment, the student loan payments became due. The Browns requested and received two six-month forbearances in order to defer their student loan obligations, from June 1997 until November 1997, and from December 1997 until June 1998, respectively. (*See* Hemar Br. (3/22/99) at 3.)

On January 28, 1998, the Browns filed for Chapter 7 bankruptcy relief. On March 2, 1998, they commenced an adversary proceeding seeking discharge of their student loan obligations under 11 U.S.C. § 523(a)(8). The Browns named Sallie Mae Servicing Corporation ("Sallie Mae") as a defendant in this adversary proceeding. Subsequently, the bankruptcy court joined Great Lakes and Hemar as addi-

tional defendants.[2] Following a trial, the bankruptcy court entered a judgment in favor of the Browns on December 14, 1998. It held that the Browns would suffer an undue hardship if they were forced to repay their student loans. *See Brown v. Salliemae Servicing Corp. (In re Brown)*, 227 B.R. 540, 548 (Bankr.S.D.Cal.1998). Additionally, it reasoned that because the statute under which discharge was sought did not allow the court to discharge partially the Browns' student loans, a full discharge was required. *See id.* at 547.

Great Lakes filed a Notice of Appeal on December 17, 1998, electing to have its appeal reviewed by this court. *See* 28 U.S.C. § 158(c)(1) (stating that an appeal is to be heard by a bankruptcy appellate panel unless any party elects to have such appeal heard by the district court); Fed. R. Bankr.P. 8001(e) ("An election to have an appeal heard by the district court under 28 U.S.C. § 158(c)(1) may be made only by a statement of election contained in a separate writing filed within the time prescribed by 28 U.S.C. § 158(c)(1)."). Hemar filed a Notice of Appeal on December 18, 1998, also electing to have the matter heard by this Court. On April 23, 1999, the Court consolidated the two cases and set a hearing date for June 14, 1999.

## DISCUSSION

### A. Jurisdiction and Standard of Review

The district courts of the United States have jurisdiction to hear appeals from final judgments of the bankruptcy courts. *See* 28 U.S.C. § 158(a). On appeal, the district court reviews the bankruptcy court's findings of fact for clear error and reviews its conclusions of law *de novo*. *See* Fed. R. Bankr.P. 8013; *Microsoft Inc. v. DAK Indus, Inc. (In re DAK)*, 66 F.3d 1091, 1094 (9th Cir.1995). Questions of statutory con-

---

1. Unless otherwise stated, the facts of this section are drawn from the bankruptcy court's memorandum decision and are not specifically contested by the parties.

2. Apparently, the promissory notes which evidenced the Browns' student loan obligations had been transferred from Sallie Mae to Great Lakes and Hemar respectively.

struction are questions of law to be reviewed *de novo.* *See DeMassa v. MacIntyre (In re MacIntyre)*, 74 F.3d 186, 187 (9th Cir.1996).

## B. Analysis

■ The bankruptcy code only allows for discharge of students loans if the repayment of those loans would constitute an "undue hardship" to the debtor. *See* 11 U.S.C. § 523(a)(8).[3] As noted, the bankruptcy court here found that the Browns' loan obligations imposed an undue hardship on them and accordingly, discharged all of their student loans. Hemar and Great Lakes challenge this action on separate grounds. Hemar contends that the bankruptcy court erred in its factual findings because the Browns did not satisfy the criteria for discharge due to undue hardship. Great Lakes contends that the bankruptcy court erred in its conclusions of law. It claims that even assuming the Browns' full student loan obligation imposed an undue hardship on them, the bankruptcy court had the equitable power to partially discharge the Browns' debt to the point that an undue hardship no longer existed, rather than having to fully discharge that debt.

### 1. Hemar

■ The bankruptcy court discharged the Browns' student loans because it found that they would suffer an "undue hardship" if forced to repay the loans. Because section 523(a)(8) does not define "un-

due hardship," the bankruptcy court relied on the three-part test set forth in *Brunner v. New York State Higher Educ. Serv. Corp. (In re Brunner)*, 831 F.2d 395, 396 (2d Cir.1987) (per curiam). This test was recently adopted by the Ninth Circuit in *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1114 (9th Cir.1998) (noting that the *Brunner* test has been adopted by the Third and Seventh Circuits and that "it has been applied by the bankruptcy and district courts in every ... circuit" except the Sixth Circuit). Under the *Brunner* test, undue hardship exists where the debtor shows:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

■ Hemar contends that the Browns did not meet any part of the *Brunner* test. Under the "minimal standard of living" prong, Hemar asks the Court to reject part of the bankruptcy court's fact-specific budget calculations. In doing so, it cites several budget items which it argues should have been eliminated from the Browns' expenses.[4] (*See* Hemar Br. at 6–

---

3. Section 523(a)(8) states in pertinent part:
   (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
   ....
   (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, *unless excepting such debt from discharge under this paragraph will impose an undue hardship* on the debtor and the debtor's dependents ....

11 U.S.C. § 523 (emphasis added).

4. One of Hemar's claims is based on an erroneous calculation. The bankruptcy court allowed Mr. Brown expenses to visit his son periodically in Oregon. However, the court determined that the $508.00 a month that Mr. Brown requested was excessive, and therefore reduced the amount by half to $254.00, reasoning that visitation would be more likely to occur every other month. Hemar does not challenge the court's decision to include these costs; instead, it only disputes the amount of the costs. Hemar contends that the bankruptcy court should reduce the amount again to $127.00 a month, because Mr. Brown's

7) (arguing that $126.35 for insurance premiums, $172.35 in car payments, and $127.00 in visitation expenses should be eliminated from the Browns' budget). However, Hemar offers no rationale for overturning the bankruptcy court's exercise of its discretion. *See Pena*, 155 F.3d at 1112 ("The method for calculating a debtor's average monthly expenses is a matter properly left to the discretion of the bankruptcy court."). Instead, the bankruptcy court properly exercised its discretion and committed no clear error justifying reversal. It carefully reviewed each of the items Hemar now challenges and offered reasons for allowing each expense. *See Brown*, 227 B.R. at 543–544 (allowing $126.35 for additional insurance because the Browns' ages and circumstances made it appropriate, $172.35 for payments on a car after the Browns surrendered their other vehicle, and $254.00 for visitation expenses relating to Mr. Brown's son in Oregon). The bankruptcy court also rejected those expenses which it found were excessive. *See id.* (finding it inappropriate to allow the Browns' IRA contributions of $150.00 per month in light of their age). Overall, the court found that the Browns, if anything, had been "extremely conservative" in their budget and that this justified adding additional expenses, none of which Hemar now challenges. Because Hemar has cited nothing in the expense calcula-

tions that justifies reversal, its challenge to the lower court's minimal standard of living finding fails.

Hemar's second contention is that the Browns failed to show "additional circumstances indicating that [their] state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. Hemar alleges that if Mr. Brown were to retire from the Marines and "utilize his specialized and marketable education," his current circumstances would not persist. (Hemar Br. (3/22/99) at 7.) Hemar contends that since Mr. Brown would receive half of his base pay upon retirement from the Marines, in addition to income from other employment, he would be able to increase his monthly income and thereby meet his student loan obligations. Therefore, Hemar argues, no additional circumstances exist indicating that the Browns' present situation will persist.[5]

■ The Court finds no clear error in the bankruptcy court's factual findings on this point. The bankruptcy court addressed the issue of Mr. Brown's education and decided that without any practical experience, he would not be able to obtain anything but an entry level position. *See Brown*, 227 B.R. at 545 (finding also that his incomplete law school education would

visitation expenses were supposed to be "$254.00 per month, every other month." (Hemar's Br. (3/22/99) at 4.) That, however, was not the finding of the bankruptcy court. To reduce the visitation allowance again by half would have the result of allowing Mr. Brown to visit his son once every four months. Because this was not the intent of the bankruptcy court and because Hemar does not challenge the court's judgment about how often Mr. Brown should be able to visit his child, Hemar's challenge on this ground fails.

5. Hemar also relies on the facts of *Pena* to show that the Browns do not meet the second prong of *Brunner*. First, Hemar points out that Pena suffered from a severe mental condition which had been diagnosed as depression, manic depression, schizophrenia, and paranoia, whereas Mr. Brown testified that

none of these conditions were present here. (*See* Hemar Br. (3/22/99) at 7.) Second, Hemar asserts Mr. Brown's earning potential was increased by his education whereas the court in *Pena* found that Pena's earning potential was not similarly increased. (*See id.*)

Hemar's reliance on *Pena* is unpersuasive. *Pena* clearly represents an example of when "additional circumstances" can be found, not an exhaustive listing of what "additional circumstances" must be present to justify an undue hardship finding. Thus, the fact that Mr. Brown does not suffer a mental illness is irrelevant because he has other "additional circumstances" showing a continued inability to meet his student loan obligations, one of which, contrary to Hemar's undeveloped argument, is the fact that his law school education did not increase his earning potential.

not increase his earning potential). The bankruptcy court further reasoned that, although the Browns would receive retirement pay, if Mr. Brown left the Marines, they would lose all medical and other benefits that the Marines offer. *See id.* Therefore, "[t]he Court [was] not persuaded that Mr. Brown would be financially better off to leave the military and pursue employment [elsewhere], even if he could find a suitable entry-level position." *Id.*

■ Finally, Hemar argues that the Browns did not make a good faith effort to repay their student loan debt. Under the *Brunner* test, good faith is defined as a "substantial effort to realize opportunities from one's education and resources as well as minimize costs of living." *See Holtorf v. Ill. Student Assistance Comm. (In re Holtorf)*, 204 B.R. 567, 570 (Bankr.S.D.Cal. 1997); *see also In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993) (holding that a good faith effort to repay student loans is measured by one's efforts to obtain employment, maximize income, and minimize expenses). In making its argument, Hemar analogizes *Brunner* to the present case. Hemar alleges that the Browns, like Brunner, did not make a single payment, and so, like Brunner, did not meet the good faith standard. Also, Hemar argues that the Browns did not minimize their personal expenses, as evidenced by the "correction to expenses" they filed, adding $508.00 for Mr. Brown's visitation expenses, $150.00 to fund two IRA's, and $172.35 in car payments. Finally, Hemar argues that Mr. Brown could get a second job in order to maximize his education and resources.

■ Hemar's reliance on *Brunner* is misplaced. In *Brunner*, the debtor filed for relief from her student loan debt within thirty days of her first loan payment coming due. *See Brunner v. New York State Higher Educ. Corp.*, 46 B.R. 752, 758 (S.D.N.Y.1985). The debtor made virtually no attempt to repay her loans, nor did she ask for or receive a forbearance. *See id.* In the present case, the Browns

sought and received two forbearances with the expectation that they would pay off their loans. They did not attempt to discharge their student loans until it was apparent that their situation was not going to improve. Furthermore, a lack of payment does not by itself preclude a good faith finding. *See Plumbers Joint Apprenticeship and Journeyman Training Comm. v. Rosen (In re Rosen)*, 179 B.R. 935, 941 (Bankr.D.Or.1995) (noting that although the debtor did not make any payments on his debt, he still made a good faith effort to repay them because the majority of his financial misfortune arose from an injury which prevented his employment); *Clevenger v. Nebraska Student Loan Program (In re Clevenger)*, 212 B.R. 139, 146 (Bankr.W.D.Mo.1997) ("[T]he mere failure to make minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payments.").

Also, as stated previously, the Browns proposed a truly frugal budget. The bankruptcy court determined that the Browns had minimized their expenses even more than they should have, which is why the court added $200.00 to their budget for miscellaneous expenses. The mere fact that the Browns corrected their budget to add expenses does not change this.

Finally, as the bankruptcy court noted, one of the reasons why Mr. Brown did not finish law school was because of his position with the Marines. If Mr. Brown were to be deployed, as was the case when he was in school, he would not be able to consistently keep a normal employment schedule. Given these circumstances, the bankruptcy court found no reason to believe that he could maintain a second job while serving with the Marines. This Court agrees.

In the case at hand, the bankruptcy court did not clearly err in its determinations of fact. Furthermore, the bankruptcy court properly applied the law in determining that the Browns met the *Brunner*

test for undue hardship. For these reasons, this Court **AFFIRMS** the bankruptcy court's decision that requiring the Browns to pay all their student loans would be an undue hardship.

## 2. Great Lakes

While Hemar challenges the bankruptcy court's budget calculations, Great Lakes argues that the lower court incorrectly applied the discharge statute. It argues that the court should have partially discharged the Browns' student loans instead of deciding that it could only either effect a total discharge or require total payment. *See Brown*, 227 B.R. at 548.

Prior to the Education Amendments of 1976, there was no prohibition on the discharge of student loans. *See* Thad Collins, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy As an Impetus to Amend 11 U.S.C. § 523(a)(8)*, 75 Iowa L.Rev. 733, 740 (1990) ("Because neither the old Bankruptcy Act nor the laws governing the student loan programs expressly prohibited the discharge of the loans in bankruptcy, they were presumed to present no impediment to discharge."). The Education Amendments limited discharge to persons who had a five-year period pass since their loans first came due, and to persons who could show that undue hardship would result if they were forced to repay their student loans. *See id.* at 742; 11 U.S.C. § 523(a)(8) (Historical and Statutory Notes). In 1990, Congress increased the discharge limitation period in section 523(a)(8) from five to seven years. *See* 11 U.S.C. § 523(a)(8) (Historical and Statutory Notes). In 1998, Congress amended section 523(a)(8) again by removing the limitation period altogether, thus allowing for discharge only when a

person establishes undue hardship. *See* 11 U.S.C. § 523(a)(8).

Congress changed section 523(a)(8) because of an increase in bankruptcy proceedings by former students trying to avoid repaying their student loans. *See Pena*, 155 F.3d at 1111. The changes to the statute clearly evince congressional intent to provide stricter enforcement of student loan obligations. Within this clear intent lies the rationale for partial discharge.

The bankruptcy court did not find it appropriate to consider a partial discharge in this case. Although it opined "that the facts of this case present a classic situation in which the Court should order that a portion of the student loans be repaid by Plaintiffs," *Brown*, 227 B.R. at 547, the bankruptcy court followed *United Student Aid Funds Inc. v. Taylor (In re Taylor)*, 223 B.R. 747 (9th Cir. BAP 1998), and found that section 523(a)(8) does not allow partial discharge.[6]

*Taylor* held that section 523(a)(8) does not allow partial discharge of student loans. *See Taylor*, 223 B.R. at 753. In arriving at this conclusion, the Bankruptcy Appellate Panel ("B.A.P.") relied on the plain language of the statute, which it held precluded partial discharge. *See id.* at 752 ("Plainly understood, 'liability on a claim encompasses the entire liability, not merely some portion of the debt or merely selected terms of repayment.'" (quoting *Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865, 866 (Bankr. W.D.Okla.1996))). Furthermore, the B.A.P. reasoned that "where Congress has failed to include language in statutes, it is presumed to be intentional when the phrase is used elsewhere in the Code." *Id.* at 753. The B.A.P. referred to the use of

---

6. The bankruptcy court noted the division among courts as to whether a ruling by a bankruptcy appellate panel ("B.A.P.") is binding on a bankruptcy court. *See Brown*, 227 B.R. at 547. It is clear that a B.A.P. ruling does not bind this Court. *See Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir.1990) ("BAP decisions cannot bind the district court themselves."); *In re Greene*, 223 B.R. 548, 550 (N.D.Cal.1998) ("Decisions promulgated by the Ninth circuit bankruptcy appellate panel ("BAP") ... are not binding on district courts.").

## 211

the phrase "to the extent" in section 523(a)(2), (a)(5), and (a)(7), which does not appear in section 523(a)(8). *See id.* The B.A.P. held that if Congress intended to allow partial discharge in section 523(a)(8), it "could have allowed a discharge 'to the extent' that such debt will cause undue hardship." *Id.*

*Taylor's* plain language argument is not persuasive. As Great Lakes points out, the phrase "to the extent" in section 523(a)(2), (a)(5), and (a)(7) serves a different purpose than it would if used to allow partial discharge under section 523(a)(8). (*See* Great Lakes Br. (3/22/99) at 8.) Specifically, it separates debts into categories which may or may not be dischargeable. For example, section 523(a)(2) states that money, property, or services are not dischargeable "to the extent" they are obtained by false pretenses or fraud. *See* 18 U.S.C. § 523(a)(2). The phrase "to the extent" thus describes the type of debt dischargeable rather than referring to the amount of debt to be discharged. Therefore, the intentional omission of the phrase in section 523(a)(8) does not support the interpretation of dischargeability under this section.

In light of the foregoing, the Court does not agree with *Taylor* that the "plain language of section 523(a)(8) implies that only the entire debt can be discharged for undue hardship ... because Congress expressly limited the extent of a debt's discharge in other subsections of section § 523." *Taylor,* 223 B.R. at 753. Rather, the fact that section 523(a)(8) does not speak to the issue of partial discharge necessitates looking to the legislative intent of the statute in order to resolve whether partial discharge is permissible.

■ Great Lakes argues that a partial discharge is the most logical and appropriate path to take in the instant case, because a full discharge would go against the Congressional intent of section 523(a)(8): "[t]o use an all or nothing approach has the effect of rendering large debt more likely of discharge, and rewarding irre-

sponsible borrowing, neither of which can be presumed to be part of congressional intent." (Great Lakes Br. (3/22/99) at 3.; *but see* Hemar Br. (3/22/99) at 10 (citing *Taylor* to argue that partial discharge is improper).) A vast body of authority supports this view. *See Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 440 (6th Cir.1998); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 361 (6th Cir.1994); *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993); *Williams v. Missouri S. State College (In re Williams),* 233 B.R. 423, 430 (Bankr. W.D.Mo.1999); *Rivers v. United Student Aid Funds (In re Rivers),* 213 B.R. 616, 619 (Bankr.S.D.Ga.1997); *Heckathorn v. United States (In re Heckathorn),* 199 B.R. 188, 196 (Bankr.N.D.Okla.1996); *Wetzel v. New York State Higher Educ. Servs. Corp. (In re Wetzel),* 213 B.R. 220, 226–27 (Bankr.N.D.N.Y.1996); *Oderkirk v. Northwest Educ. Loan Assoc., Fin. Assistance (In re Oderkirk),* Nos. 94–01078, 94–6226, 1995 WL 241338, at *3 (Bankr.D.Idaho April 13, 1995); *The Cadle Co. v. Webb (In re Webb),* 132 B.R. 199, 202–03 (Bankr. M.D.Fla.1991); *Virginia Educ. Loan Auth. v. Archie (In re Archie),* 7 B.R. 715, 719 (Bankr.E.D.Va.1980). These courts have generally concluded that the language of section 523(a)(8) is ambiguous and have therefore relied on congressional intent and the equitable powers of the bankruptcy courts to allow partial discharge. To this end, the Supreme Court has noted that when a "literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, ... [then] [i]n such cases, the intention of the drafters, rather than the strict language, controls." *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

■ Because the language of section 523(a)(8) is ambiguous, the Court is persuaded by *Hornsby,* where the Sixth Circuit held that a bankruptcy court has the authority to partially discharge a debtor's

student loan by virtue of 11 U.S.C. § 105(a). *See Hornsby,* 144 F.3d at 440. Section 105(a) states:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). This "statutory directive [is] consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Resources Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990).

The Sixth Circuit reasoned that in certain "close-call" situations, an all-or-nothing approach to dischargeability would thwart the purpose of section 523(a)(8). *See Hornsby,* 144 F.3d at 440. Section 105(a) allows the bankruptcy courts to tailor a solution around the circumstances of an individual case. The Sixth Circuit cited its own decision in *Cheesman* as an example of the equitable powers of section 105(a) in a student loan discharge case.

*See Hornsby,* 144 F.3d at 439 (citing *Cheesman*).

In *Cheesman,* the bankruptcy court held that the debtor qualified for a discharge of her student loans on the grounds of undue hardship. *See Cheesman,* 25 F.3d at 360. However, it decided to stay its order for eighteen months in order to determine whether the debtor's financial situation would improve, thus making discharge unwarranted. *See id.* at 360–361. The Sixth Circuit held that the bankruptcy court properly used the equitable powers of section 105(a) in granting the stay. *See id.* It reasoned that "the court appropriately attempted to balance the Bankruptcy Code's goal of providing a fresh start to the Cheesmans with Congress's goal of preventing abuse of the student loan program." *Id.; see also Roberson,* 999 F.2d at 1138 (ordering a two-year deferment in order to determine the debtor's future financial status).[7]

Following the reasoning of the Sixth Circuit, this Court finds that section 105(a) allows a partial discharge in this case.[8] The Court therefore **REVERSES** the bankruptcy court's determination that partial discharge was impermissible and **REMANDS** the case to allow the bankruptcy court to balance the Browns' right to a "fresh start," with Congress's goal of making student loan dischargeability more difficult.

---

7. Without relying on section 105(a), two courts within the Ninth Circuit have also held that, in certain situations, a partial discharge of a debtor's student loan obligations is equitable. *See Oderkirk,* 1995 WL 241338, at *3 ("Where a complete denial of discharge is not appropriate, bankruptcy courts have the equitable power to either restructure or partially discharge student loans."); *Littell,* 6 B.R. at 89 (holding that it would be an undue hardship for the debtors to repay the entire student loan, but that some payment could be made). Both of these opinions were decided prior to *Taylor, supra.*

8. An alternative means of justifying partial discharge is set forth in *Heckathorn,* where the court decided that because of the ambiguous language of section 523(a)(8), courts should follow the "congressional scheme"

that underlies the statute. *See id.* at 196. The court found that balancing the dual purposes of section 523(a)(8)—discharging debts to allow the debtor a "fresh start" against excepting from discharge those debts that can be repaid—justified a partial discharge. *See id.* The court stated that the alternative all-or-nothing approach would result in insufficient discharge in some instances and insufficient repayment in others. *See id.; see also Wetzel,* 213 B.R. at 226–27 ("Authority for reducing the total amount of indebtedness arises from an interpretation of [section] 523(a)(8) which permits discharge of that portion of the indebtedness which constitutes an undue hardship, but holds the debtor responsible for the amount up to that limit of hardship.").

## CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the bankruptcy court's finding that the Browns met the undue hardship standard. The Court **REVERSES** the bankruptcy court's holding that section 523(a)(8) does not allow for partial discharge and **REMANDS** the case to the bankruptcy court to determine the amount of student loans to be discharged.

**IT IS SO ORDERED.**