**In re Jennifer TURRETTO, Debtor.**

**Jennifer Turretto, Plaintiff,**

**v.**

**United States of America, Defendant.**

**Bankruptcy No. 99–50099–ASW.**
**Adversary No. 99–5137.**

United States Bankruptcy Court,
N.D. California.

Oct. 12, 2000.

---

Jennifer J. Turretto, San Jose, CA, for plaintiff/debtor, in propria persona.

Marc A. Fisher, Alameda, CA, for defendant/creditor.

## MEMORANDUM DECISION HOLDING STUDENT LOAN DISCHARGEABLE PURSUANT TO § 523(a)(8)

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

Chapter 7 Debtor Jennifer Turretto ("Debtor") initiated this adversary proceeding, seeking discharge of a government-insured student loan ("loan") under § 523(a)(8)'s "undue hardship" exception.[1] This matter came before the Court for

---

1. Unless otherwise noted, all statutory references are to Title 11, United State Code (11 U.S.C., the Bankruptcy Code), as amended in 1994, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

2. The Court finds all of Debtor's listed expenses to be reasonable. None provides more than a minimum standard of living for Debtor and her children.

trial. Debtor appeared *in propria persona* and Marc Fisher, Esq. represented Creditor United States of America ("Creditor"). Debtor was the sole witness at trial, testifying on her own behalf and submitting to cross examination.

At the close of the trial, this Court issued a tentative ruling finding the loan dischargeable, but requested that Creditor furnish an accounting of amounts paid under the loan and the exact amount owing as of the date of the trial. Debtor was given an opportunity to respond to the accounting within one week from its receipt. The Court received Creditor's accounting. Debtor did not respond to it. This Court finds that: (1) the failure to discharge the loan would constitute an "undue hardship" upon Debtor and Debtor's dependents under § 523(a)(8); and (2) the loan must be discharged in full rather than in part.

The following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### STATEMENT OF FACTS

The following facts are undisputed.

Debtor is a physically healthy, 35 year old mother of three children, ages 9, 11 and 15—the youngest two live with their father; the oldest with Debtor. Debtor regularly visits her two younger children on alternate weekends and holidays; for six weeks each summer, they temporarily live with Debtor.

Debtor's monthly expenses, none of which were challenged by Creditor[2], are:

| | |
|---|---|
| Food | $ 400.00 |
| Car Payment | 280.00 |
| Rent | 650.00 |
| Child Support | 500.00 [3] |

---

3. Debtor presently pays $188 a month in court-ordered child support for her younger children. However, Debtor testified that due to her higher annual income for the current year, the amount of child support is likely to increase to $500 a month. The Court calculated Debtor's expenses using each of these figures.

| | |
|---|---|
| Automobile Insurance | 60.00 |
| Minimum Credit Card Payment | 25.00 |
| Telephone | 40.00 |
| P.G. & E. (approximate) | 120.00 4 |
| Water and sewer | 22.00 |
| Medical Insurance (for Debtor and children, but no dental plan) | 175.00 |
| Gasoline (approximate) (driving to and from work; to visit younger children in Los Banos) | 150.00 5 |
| Household Necessities | 60.00 |
| Clothing for her eldest son | 41.67 |
| Dental for her eldest son | 7.50 |
| Miscellaneous (15 yr old's school activities, plus bus fare to school [.60/day, 4 days/week], etc.) | 55.00 |
| Loan ($2,000) (from current employer for down payment to purchase vehicle) | 215.00 6 |
| Therapy Sessions (for depression) | 43.00 7 |
| TOTAL | $ 2,844.17 |

Debtor's total monthly expenses at the current rate of child support she pays for her two younger children ($188) are $2,532.17.

Debtor left school at the age of 14 without completing the eighth grade. Since that time, Debtor has received no formal schooling or vocational training, except for completing Lawton Business School's six-month program in basic computer skills in approximately 1987. The loan at issue in this case paid for Debtor to take that course. Debtor testified that, by the time she completed this basic computer course, the skills she had learned had already become obsolete in the market place.[8]

Debtor was on public assistance ("welfare") during all or most of the period 1984 through 1986. She testified that she took the Lawton Business courses to "get off welfare". Since taking the course, Debtor has held a succession of jobs, bridged by several periods during which she received unemployment compensation and/or other forms of public assistance.

Debtor's first job began in 1986 as a customer service representative in a brokerage firm. This position lasted for two years, at which time Debtor left to establish a day care center in her home. When that enterprise failed, Debtor was forced to go on public assistance. She testified that, for a period of some four years afterwards, from 1991 though 1994, "jobs came and went"; Debtor estimated that she held about six different jobs during this period and also received unemployment benefits between jobs.

In 1995, Debtor went to work for an organization providing social services,

4. Debtor testified that her P.G. & E. bills average $150 per month. She explained that her bill averages $200 to $250 per month during December and January and $80 during the summer months. Although she was not questioned about these figures, the Court finds that Debtor's estimates are probably a little higher than the actual amount of the bills. Her P.G. & E. bill for January 15 through February, 15, 1999 (Trial Exhibit 2), for example, was $141.16. Debtor testified that she routinely "juggles" her P.G. & E., telephone and water bills—which meant that she has to skip paying one or more bills each month and then make up the arrearage at a later time. The P.G. & E. bill referenced above shows a past due balance of $186.74 (which may well include the amount of her bill for December 15, 1998 through January 15, 1999) for a total due of $327.90. Thus she may be accustomed to thinking that her P.G. & E. bill is higher than it actually is because she often has to pay for more than one month's service when she pays. Based upon the evidence before it, the Court estimates the average amount of her P.G. & E. bill at $120 per month.

5. Debtor pays about $25 per week for gasoline plus an additional $20 every other week to drive to and from Los Banos to visit her younger children. $25 × 4.3 = $107.50; $10 per week times 4.3 = $43. Total $150.50. (There are approximately 4.3 weeks in a month.)

6. Debtor testified that she was repaying this loan to her employer at $50 *per week* and that this amount was deducted directly from her paycheck. Assuming that this is the correct amount of her payment, then, assuming 4.3 weeks per month, she is paying her employer $215 per month. The Court originally had the impression that these loan payments were $50 *per month*, but, during the trial, sought clarification from Debtor who explained on the record that they were $50 per week.

7. $10 per week times 4.3 weeks per month.

8. The Court does not rely on her testimony as to the lack of benefit from this course as a reason to discharge the instant loan. However, the value of Debtor's education is relevant to her future ability to repay this student loan. See *In re Pena*, 155 F.3d 1108, 1113 (9th Cir.1998).

where she remained for three years until she was terminated due to lack of funding for the organization's programs. For an unspecified period of time after her termination, Debtor was unemployed and received unemployment benefits. However, during 1999, Debtor, through personal contacts in her church, obtained employment as an assistant in a paralegal firm for a brief period of time. Her primary duties there were answering the telephone and scheduling appointments. Debtor's salary for all of her previous jobs ranged from a low of $7 per hour to a high of $9 per hour. That is, in her lifetime, Debtor had never earned more than $9 an hour—until five and one-half months prior to the trial in this case. Debtor's gross annual income for the year before trial, a substantial portion of which was from unemployment benefits, was approximately $9,000.

In October of 1999, Debtor obtained her current position, which she testified was based on the recommendation of a friend of her ex-husband. Debtor believed she would not otherwise have qualified for this job because of her lack of education and training. In her current position, Debtor's duties include some typing, entering and paying bills using a straightforward computer system, answering the telephone, putting work job packets together, receiving and processing in-coming mail, and other light secretarial tasks. Debtor is now earning the highest wage she has ever earned: $15 an hour, with an average of 36–38 hours a week, for a gross weekly income of $555 (37 times $15). Multiplying $555 times 4.3 weeks per month equals a gross monthly income of $2,386.50. Assuming Debtor maintains her current employment, and is paid for 52 weeks, she will earn a maximum annual income of approximately $28,638 for the current year (12 times $2,386.50).[9] Debtor testified that her "net" take-home pay is $1,910 per month. However, that amount does *not* reflect her actual "take-home" pay. She explained that this figure is *before* her employer's loan ($215 per month) and her medical insurance ($175) are deducted from her pay check and before she pays child support ($188 or $500).

The student loan in question in this case was taken in 1987. On or about May 29, 1987, Debtor executed a promissory note to secure a loan of $2,525.00 from Trans World Insurance Company, Sacramento, California at eight percent (8%) interest per annum.[10] The Debtor made a number of payments on the loan—but the number of payments and amount of each is not at issue in this case since Creditor stipulates that Debtor has made a good faith effort to repay the loan. Although the record was not clear as to the exact balance of the loan on the date of trial, the balance, including principal and interest, was approximately $4,700, with interest alleged by creditor to be accruing at $.58 per day on the principal amount. It is also not clear what the repayment period was on this loan. The Court cannot locate that term on the largely illegible copy of the promissory note introduced into evidence by Creditor.

## I. APPLICABLE LAW

### A. § 523(A)(8)'S "UNDUE HARDSHIP" EXCEPTION

Section 523(a)(8) excepts from discharge "a loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit ... unless excepting such debt from discharge ... will impose

---

**9.** Debtor will not actually earn this amount because she will not likely be able to work all day, every single day, five days per week, for 52 weeks. She only has a one-week vacation per year. The record was not clear as to whether she is paid for Federal holidays or sick leave, but the Court has the impression that she may not be. Thus, her annual gross salary is likely to be less than $28,638.

**10.** The 8% interest rate is asserted by Creditor and may be a default rate of interest. The copy of the promissory note offered into evidence by Creditor is hard to read. The applicable interest rate may be 6% or 7%.

an undue hardship on the debtor and the debtor's dependents."

The concept of "undue hardship" is not defined by the Bankruptcy Code, nor can a definition be found in § 523(a)(8)'s legislative history. Nevertheless, in *In re Pena*, 155 F.3d 1108 (9th Cir.1998) ("*Pena*"), the Ninth Circuit adopted the three-part test of *In re Brunner*, 46 B.R. 752 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2nd Cir.1987) ("*Brunner*") for determining the existence of "undue hardship" under § 523(a)(8). *See Pena* at 1111 (*discussing Brunner*).

■ Under the *Brunner* test, debtor has the burden to prove each of the following:

(1) That debtor cannot maintain a "minimal" standard of living for debtor or debtor's dependents, based on debtor's current income and expenses, while simultaneously repaying the loan;

(2) That additional circumstances exist indicating that this state of affairs will persist over the life of the loan repayment period;

(3) That the debtor has made a good faith effort to repay the loan.

■ The first prong requires more than "a showing of tight finances." *In re Nascimento*, 241 B.R. 440, 445 (9th Cir. BAP 1999) ("*Nascimento*"). Though a showing of temporarily difficult circumstances is not sufficient, neither does a debtor have to demonstrate "utter hopelessness" to prevail under this prong. *Nascimento*, 241 B.R. at 445. Rather, a court must find that requiring Debtor to reduce expenses further or increase current income would be " 'unconscionable.' " *Id.* at 445 (*quoting In re Faish*, 72 F.3d 298, 307 (3rd Cir.1995)). In evaluating the debtor's present circumstances—specifically, the debtor's current monthly income and expenses—the court has discretion to make determinations about the reasonableness of individual budgeted expenses. *In re Peel*, 240 B.R. 387, 392 (Bankr.N.D.Cal. 1999) (citing *Pena*, 155 F.3d at 1112).

■ Under the second prong of *Brunner*, the debtor must show the existence of extenuating circumstances likely to persist over much of the repayment period of the loan. Although a court's prediction in this regard is an inexact science, the following factors may be indicia of a debtor's inability to repay a loan in the future: (1) failure to derive economic value from a professional degree or license, *see, e.g., Peel*, 240 B.R. at 394; (2) lack of education or training, *see, e.g., In re Siebert*, 10 B.R. 704, 705 (Bankr.S.D.Ohio 1981); (3) large number of dependents, (4) lack of marketable skills.

■ Under the third prong of *Brunner*, the debtor must demonstrate a good faith attempt to repay the loan. Failure to make even a single payment does not foreclose the debtor's ability to make such a showing where the debtor never had the ability to pay. *Compare In re Rose*, 215 B.R. 755, 765 (Bankr.W.D.Mo.1997) (existence of forces beyond the debtor's control precluding even a single payment being made does not negate finding of good faith effort to repay), *and Peel* at 395–96 (good faith effort shown, despite only two payments made by the debtor), *with Brunner*, 831 F.2d at 397 (seeking "undue hardship" discharge within one month of first loan payment due date, less than one year postgraduation and with no prior attempts at deferment constituted lack of good faith effort to repay).

## B. Partial vs. Whole Discharge of Student Loan Debt

Assuming that Debtor carries her burden to satisfy all three prongs under the *Brunner* test, the next issue is that of partial or whole discharge of the loan. Although the Ninth Circuit Court of Appeals has not addressed the issue, the Ninth Circuit Bankruptcy Appellate Panel ("BAP"), in *In re Taylor*, 223 B.R. 747 (9th Cir. BAP 1998) ("Taylor"), held that a student loan could not be partially discharged. The BAP reasoned that Congress's failure to draft language in

§ 523(a)(8) allowing for partial discharge was intentional, especially in light of other subdivisions of § 523(a) that discharge certain debts but "only to the extent" that such debts are not incurred by way of specific, enumerated acts. *See, e.g.,* § 523(a)(2), § 523(a)(5) and § 523(a)(7). Absent similar limiting language, § 523(a)(8), the BAP concluded, does not provide for partial discharge of a student loan debt.

In reaching its conclusion, the BAP specifically disavowed the use of a bankruptcy court's equitable powers under § 105 to permit partial discharge of a student loan, as the Sixth Circuit had expressly permitted in *In re Hornsby,* 144 F.3d 433 (6th Cir.1998). Instead, the BAP held that § 105 powers cannot be used to fashion a remedy that would "circumvent the clear and unambiguous language of § 523(a)(8)." *Taylor,* 223 B.R. at 754.

### ANALYSIS

#### I. Debtor Satisfies Brunner's Three Part Test

■ Creditor concedes that Debtor satisfies the first and third prongs of *Brunner's* three part test, *i.e.,* inability to maintain a minimal standard of living while repaying the loan, and good faith effort to repay. The Court agrees with Creditor that Debtor has carried her burden under these two prongs of the *Brunner* test. Therefore, the Court will focus exclusively on Creditor's contention that Debtor has not satisfied the second prong under

*Brunner;* namely, the existence of additional circumstances that would preclude Debtor from repaying the loan over a significant portion of the repayment period.[11]

Creditor argues that Debtor has shown remarkable resilience, increasing a previous annual gross income of $9,000 in 1999 to a projected annual gross income of $28,638 for the current year. Debtor's "net" income is $1,910 per month, *i.e.,* $22,920 per year. However, she, in fact, "brings home" far less than $1,910 per month after subtracting from that figure her employer's loan ($215), medical insurance for her and her eldest son ($175), and child support for her two younger children ($188 or $500).

Creditor also argues that Debtor could, based on skills acquired in her current position and a booming local economy, obtain a better job and increase her income in the future. Therefore, Creditor argues that Debtor has not proven that additional circumstances exist indicating that Debtor's current inability to repay would persist over the loan repayment period.

However, this Court finds that several important factors exist impairing Debtor's ability to repay this loan over the life of the repayment period.[12] First, Debtor's lack of education is a major impediment to Debtor's ability to increase her income in the future. Debtor testified that she never graduated from the eighth grade. Since that time, Debtor's only formal training was the six months she spent at the Law-

---

**11.** Counsel for Creditor stated to the Court in his opening remarks that Debtor might be eligible for what he described as the "Ford Program." The Court understood from counsel's explanation that the program included a deferred payment schedule pursuant to which a debtor would pay a debt over time with interest (essentially, a restructuring of the loan). Counsel stated that Debtor had "applied" for the Ford Program, but she had expressed to him concerns about the repayment terms (specifically, the interest term) that kept her from following through with it. However, absolutely no evidence was presented as to the precise nature of this program, who sponsors it, or what payment terms might be available to this Debtor. Nor was

there any evidence to the effect that Debtor was, or would be, accepted into the program. Creditor did not contend that Debtor had a contractual or other legal obligation to pursue this program. To the extent that this program might have represented a possible settlement alternative between Debtor and Creditor, it was apparently not finalized. Given that no evidence about this program was introduced, it is not relevant to this lawsuit, and the Court makes no findings with respect to it.

**12.** As noted above, the record is not clear what the repayment period was under this loan. The promissory note is largely illegible.

ton Business School in 1987, learning basic computer skills, which Debtor testified were obsolete by the time she reached the work force. As a result of her lack of education and employable skills, her work history has been at very low levels and has been unstable. Debtor testified she obtained her current position, as well as previous positions, based on personal contacts, typically through Debtor's church or (in the case of her current job) through a friend of Debtor's ex-husband. Debtor has only worked at her present position for five and one-half months. The skills that Debtor has learned at her current job are very basic—not the type of skills that would significantly increase her earning power or marketability. The most Debtor had ever earned before this job was $7 to $9 per hour. And, before obtaining her current job (through her ex-husband), she had applied without success for other jobs.

> *Counsel for Creditor:* Are you aware that down here in Silicon Valley that the job market is pretty good for people who need to get jobs?
>
> *Debtor:* For what kind of jobs?
>
> *Counsel:* Well, just in general?
>
> *Debtor:* That the ... you mean the job rate is open to ...
>
> *Counsel:* Well, I'm just trying to get at whether you are aware that there are a lot of good jobs out there for people that have improved their skills.
>
> *Debtor:* I have applied. I applied before I applied for this one. And I wasn't getting hired. I wasn't even getting called for an interview.

Debtor testified that she learns quickly and regards herself as intelligent,

> ... but when I go for interviews, they don't care. To make good money, they want you to have a degree. They want you to have education under your belt.

Undoubtedly, as Creditor asserts, the job market in San Jose for skilled employees has benefitted from the vigor of the local economy; however, this Court is persuaded by Debtor's testimony that competition in the workforce is equally strong and that opportunities available to one with her lack of requisite training and education are very limited. While the Court is convinced that, if necessary, Debtor could find another job, such employment might take some time to obtain and would likely pay in the $7 to $9 per hour range that Debtor earned before.

This Court is also persuaded by Debtor's testimony that she did not gain any significant, marketable skills from her current position, and previous positions, which could, in turn, be used to procure more profitable employment. Debtor's duties in prior positions were of a quasi-clerical nature: answering phones and mail. Her current duties, which she described as "very basic stuff," are also very rudimentary. Debtor testified that, although she has added some office computer programming to her repertoire of skills, she has not gained new skills which could properly be termed marketable. Some evidence of her level of skill is Debtor's testimony that she was sent home by her current employer for mistakes in her work.

Debtor's precarious position with her current employer is a third factor indicating her inability to repay the loan over the repayment period. Currently, Debtor works for a small office, rather than a large institution. She testified that her employer has a limited budget and may well recoup losses by decreasing the number of employees. She has only worked there for five and one half months. Debtor considers herself the most "expendable" of the current employees and testified that she is the most vulnerable to being sent home or to being terminated altogether. On one occasion, after she made a mistake on the job, her employer sent her home without pay for the remainder of the day. On another occasion, she told her employer that she had to leave work to pick up her son at school, but that she would return to finish the work day. Her employer told her to take the remainder of the day off. She told him that she could not afford to lose the income, but he told her to clock out for the day, and so she did.

Counsel for Creditor attempted to demonstrate, through Debtor's testimony, that Debtor's job prospects for the future were good. Debtor was clearly both pleased and grateful to be earning $15 per hour in her current position, but had no confidence that she could even maintain that salary, much less improve upon it. In response, she testified credibly:

It would be great if I could continue to make $15 an hour. I don't see that happening. I believe right now is a blessing. How long it's going to last I don't know.

Moreover, while Debtor is currently struggling with a monthly deficit of approximately $934 (based on paying $500 per month in child support) or $622 (based on paying $188 per month in child support) [13], this deficit is likely to increase in the future.[14] Debtor will remain financially responsible for her two younger children for a number of years in the future. Currently, Debtor pays $188 in monthly child support; however, she testified without contradiction that, based on her higher income for the current year, that amount will likely increase to $500.

Debtor's current employment is also insecure because of her child care responsibilities—particularly during the summer. For six weeks each summer, Debtor's younger children come to live with her. In the past, Debtor's jobs have been flexible enough for her to work part time during these visits, or these visits took place while she was receiving some form of unemployment or public assistance. Debtor testified that her current job would not provide that flexibility.

Now I have a full time job and my boss is not flexible in that way. I just don't think the boss that I have now is going to be able to do anything or work with me as far as that goes.

Debtor has only one week of vacation per year and was unsure whether that would be paid or unpaid leave. She testified that in the previous year her oldest son was able to watch the younger children for about half of each day, but that his tolerance for that responsibility was limited to half a day. She had some ideas but had no definite plan as to how to arrange for her children's visits during the coming summer without the flexibility to work part time. She cannot afford child care. Her 82 year old father might not be able to take care of two active children every day. She had the idea that she might find a boarder who would live in her house to help defray expenses, and she hoped that the same boarder might also be able and willing to watch her younger children while she was at work. The probability that she would find a boarder to share her house (this person would have a bedroom but would *not* have his/her own separate apartment within her house), whom she trusted to watch over her children, seemed very speculative to this Court. She also mentioned the possibility of cutting short her visits with her younger children. However, the Court was convinced that such visits are extremely important to her. It would be very hard for her to shorten them significantly. This dilemma contributes to the insecurity of her present employment situation.

Debtor's basic housing situation is also precarious. Debtor's 82 year old father owns the three-bedroom house in which she and her oldest son are living. Her father charges her $650 per month for rent. Debtor testified that, if she had to move, she would have to pay $1,400 per month or more to rent a place for her and her son. The Court takes judicial notice of the extremely tight and expensive rental housing market in this region. Debtor is most certainly paying far below the fair rental value of this house, even though, as Debtor testified, it needs many repairs. If Debtor had to find alternative housing, she

---

**13.** $1,910 net monthly income less her monthly expenses.

**14.** It is not possible to calculate the precise amount of the deficit in Debtor's budget because the Court does not have an exact "net take home pay" figure for her.

would likely have to pay more than two to three times $650 per month for even a one- or two-bedroom apartment in one of the least costly sections of this area.

Given her father's age, Debtor's housing situation is very insecure. Although it is possible she might share with her siblings in any inheritance her father might leave (her father also owns a second house in which he lives), any such possible inheritance is completely speculative and not supported by the record. No evidence was presented, for example, as to the value of either house, the respective mortgages, whether there is any equity in either house, the father's other assets and debts, whether or not he has executed a will, and, if so, its provisions, etc.

Debtor did testify that if her father were to pass away, her sibling(s) would not permit her live in the house for only $650 per month. Debtor's housing situation, which temporarily favors her, is problematic in the longer term. She simply cannot rely on paying dramatically below market rent in the future.

Debtor's ex-husband [15] pays for her oldest son's private school, plus about $50 per month of his miscellaneous expenses (*e.g.*, for half the cost of his clothing, for sports events, and some minimal occasional cash). The record was not clear whether this was a voluntary arrangement or court-ordered. Counsel for Creditor suggested to her that she could try to obtain additional support from her former husband or she could send her son to public school and try to obtain money from her ex-husband to pay back the loan at issue in this case. Debtor explained that she had already asked her former husband for additional money and had also considered taking him to court. However, he is paying child support for his two other children (who have a different mother) in addition to her son. She believed she would fare poorly if she pressed him in court. She also felt that her son benefitted most from the current arrangement. The Court finds that Debtor's testimony was credible. Her former husband, a "contractor" of some kind, is currently willing to pay for the eldest son's private school. Whether Debtor could obtain any child support from him, and, if so, in what amount, if she contested this matter in court, is entirely speculative. No evidence was presented as to whether he would be willing, or able, to pay this school expense, or to provide any support, in the future. Indeed, no evidence was presented as to her former husband's present or expected future financial situation. However, even if Debtor's former husband were ordered to pay and did pay Debtor several hundred dollars per month in child support for three years (until their son was eighteen years old), Debtor would be unable to repay the loan in question and still maintain a minimum standard of living. Plus, it would likely cost Debtor money to pursue him in court for child support. There was no evidence that she had the funds to pursue him for child support.

Debtor recently had to purchase a used car to travel to and from work and to visit her two younger children in Los Banos (which is about 80 miles from San Jose). That will likely create a major financial strain for her. Her regular car payments, which are $280 per month, begin the month after the trial in this case. In addition, she borrowed $2,000 from her current employer for the down payment. He deducts $50 per week (*i.e.*, $215 per month) from her paycheck for this loan.[16] He graciously did not charge her interest on the loan, *if* she remains employed with him. However, she testified that if she quits or is terminated from her employment within 14 months, she must pay him 18% interest on the unpaid balance.[17]

---

15. Debtor's two younger children have a different father to whom Debtor pays child support.

16. These deductions should cease when she repays this loan.

17. The record was not clear as to exactly how the 18% interest term operated for this loan. It may or may not be a legal rate of interest.

In addition, Debtor pays for gasoline (at the recently increased pump prices) and will have to pay for car insurance. She is not used to having a car payment and this expense—both the basic car payment ($280) and the monthly payments on the loan from her employer ($215)—represent an additional major strain on her. She has not yet had to handle the full financial burden of ownership of this car because her father paid $360 for her first six months of car insurance (at $60 per month). She will have to pay another $360 for insurance once that period has expired. Counsel for Creditor asked Debtor whether she felt that by working in her present job for $15 per hour, she was digging herself out of a financial hole. In response she testified that she was concerned that, by buying a used car (which she absolutely needed), she had placed herself back in a hole.[18]

Debtor's list of expenses is minimal and includes no money at all for clothing, make-up, or entertainment of any kind for her. She testified that her sisters give her used clothing and shoes and that she buys nothing for herself. She can dress informally for her current job.

Counsel for Creditor has stipulated that Debtor has tried in good faith to pay back this loan. It is important in this regard to stress that Debtor borrowed the money to attend business classes in *1987*. That means that, although she concededly has tried in good faith to repay this debt, she has been unable to pay all or a substantial portion of the loan back in *twelve years*. That is significant evidence that she is not likely to be able to pay the loan back in the future, without a significant change in her circumstances.[19] Debtor testified on cross examination that the best way for her to improve her financial situation would be to return to school. However, she stressed that she needs to work to support herself and her children. She also testified that she once tried going back to school, but had to quit again in order to work.

Accordingly, this Court finds that, Debtor having satisfied the second prong under *Brunner* (existence of additional circumstances precluding repayment over the life of the loan), and Creditor having conceded the first and third prongs under *Brunner* (minimal standard of living and good faith effort to repay), forcing repayment of the loan would constitute an "undue hardship" under § 523(a)(8) upon Debtor and her dependents.

## II. The Student Loan Debt Must be Discharged in Full

■ Creditor contends that even if "undue hardship" is shown, the loan should only be partially discharged. In support of its position, Creditor cites *In re Brown*, 239 B.R. 204 (S.D.Cal.1999) (*"Brown"*) which rejects *Taylor*'s "all or nothing" approach on discharging student loans. Instead, the district court held that, far from unambiguously precluding a partial discharge, the language of § 523(a)(8) was silent on the issue, requiring a court to look "to the legislative intent of the statute in order to resolve whether partial discharge is permissible." *Brown*, 239 B.R. at 211. Not only did the district court conclude that partial discharge was permissible, but it also rejected *Taylor*'s argument that § 105 did not permit a bankruptcy court to discharge portions of student loans.[20] However, *Brown*'s main argument for a partial discharge is premised upon the fact that an "all or nothing

---

**18.** Debtor testified that, when her old car stopped functioning, she had to rent a car in order to visit her younger children in Los Banos.

**19.** As noted above, the copy of the promissory note introduced into evidence by Creditor is illegible in substantial part. The Court could not find the repayment period of this loan. Even assuming, *arguendo,* that the original repayment period was 20 or even 30 years, Debtor would be unable to repay it over time and still maintain a minimum standard of living.

**20.** In rejecting *Taylor,* the district court discussed whether Ninth Circuit BAP decisions were binding on any other courts in this jurisdiction. This Court does not reach this issue.

approach has the effect of rendering large debt more likely of discharge, and rewarding irresponsible borrowing." *Id.* This is not the case here.

In the instant case, Debtor's student loan debt was not a product of "irresponsible borrowing." Unlike the debtor in *Brown* who failed to complete law school after four years, Debtor here completed her courses on schedule. Debtor, having never finished eighth grade, took out a loan for Lawton Business School to receive basic computer training. She was receiving public assistance when she took the Lawton course. She needed to support her children and to gain enough skills to "get off welfare." However, Debtor testified that, once she finished Lawton Business School, "everything I learned was obsolete."

According to *Brown*, a large debt should not be fully discharged, if a portion of it can be paid back. *Id.* at 211. However, the Ninth Circuit Court of Appeals has yet to rule on this issue. In *Brown*, the debtor was believed to be able to pay off some of the $96,000 loan. *Id.* at 206. In the instant case, Debtor's loan is only about $4,700, and she has shown that her monthly expenses of $2,844.17 are greater than her net income of approximately $1,910.

Therefore, a partial discharge would be inappropriate under the facts of this case—including Debtor's lack of education and marketable skills, her income, expenses, and the tenuous nature of her job situation. Debtor would find it impossible to repay any significant portion of this loan while still maintaining a minimum standard of living. Therefore, if the Court had discretion to discharge only a portion of this loan, this Court would still grant a total discharge for the Debtor.

### CONCLUSION

For the stated reasons above, Debtor's obligation to the United States of America will be discharged in full pursuant to 11 U.S.C. Section 523(a)(8). A failure to discharge the student loan debt would place an undue hardship upon the Debtor by placing her in a situation where she would likely be unable to maintain a minimum standard of living.

Since Debtor is *in propria persona*, the Court will prepare a form of judgment in this adversary proceeding.