**In re Janet L. COUTTS, Debtor.**

**Janet L. Coutts, Plaintiff,**

v.

**Massachusetts Higher Education Corp., D/B/A American Student Assistance, and Educational Credit Management Corp., Defendants.**

**Bankruptcy No. 99–42550 (JBR).
Adversary No. 99–4183.**

United States Bankruptcy Court,
D. Massachusetts.

June 15, 2001.

Kenneth D. Quat, Concord, MA, for Janet L. Coutts, Plaintiff/Debtor.

John F. White, Topkins & Bevans, Braintree, MA, for Educational Credit Management Corp., Defendant.

## MEMORANDUM OF DECISION AND ORDER

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter is before the Court on a complaint alleging that certain student loans owed by Janet L. Coutts, hereinafter the "Debtor," to Educational Credit Management Corp., hereinafter "ECMC," [1] are dischargeable insofar as the repayment of such loans constitutes an undue hardship pursuant to § 523(a)(8) of the Bankruptcy Code.

ECMC raised a counterclaim against the Debtor requesting dismissal of the complaint with prejudice, a judgment on the student loans with interest, reasonable attorney's fees and costs of collection against the Debtor, and a determination that such judgment is nondischargeable. The Debt-

---

1. Massachusetts Higher Education Assistance Corporation d/b/a American Student Assistance was originally named as the defendant in this matter. However, ECMC moved to be added as a defendant as all loans concerned herein were transferred to it in or about August 1999.

or did not formally answer the counter-claim, but the parties stipulated in their Second Joint Pretrial Stipulation that the only issue is whether the loans are dischargeable under 11 U.S.C. § 523(a)(8).

## I. FACTS:

The parties agree that the Debtor owes four student loans to ECMC, hereinafter "the Loans," which the Debtor used to pay for her education at the Boston College Graduate School of Social Work. The Debtor graduated in 1994 with a Masters in Clinical Social Work. The Loans were made under a program guaranteed by a governmental unit or funded in whole or in part by a governmental unit or nonprofit institution, and evidence a loan to repay funds received for an educational benefit. The current cumulative balance on the loans is $47,969.85, broken down as follows: (# 1) $9,317.83; (# 2) $16,787.15; (# 3) $11,122.38; and (# 4) $10,742.49. The Debtor obtained loan # 1 in July 1991, # 2 in July 1992, loan # 3 in July 1993, and loan # 4 in August 1993. Absent a finding of undue hardship the loans are nondischargeable.

The Debtor was the sole witness at trial. Based upon her testimony and the documentary evidence presented the Court finds the following facts. The Debtor is forty-two years old. She holds a Bachelor of Arts from Roger Williams College and the aforementioned Masters in Clinical Social Work from Boston College. Since August 1997 the Debtor has been employed as a Clinical Social Worker for Spectrum Outpatient Health Services in Worcester, Massachusetts and has no other source of income. Although the Debtor works twen-ty clinical, and twenty to twenty-five non-clinical, hours per week, she is only paid for the clinical hours. The Debtor receives paid vacation time and sick time, and subscribes to United Healthcare medical insurance, as well as dental insurance through her employer. The Debtor earned $28,825.10 in 1998, $30,829.44 in 1999 and $31,089.35 in 2000. The Debtor received tax refunds for 1999 in the cumulative amount of $1,400.00, and this year she expects to receive her year 2000 refunds in the approximate amount of $1,500.00. Her 2001 income is expected to be between $32,000.00 and $33,000.00. The Debtor's monthly after tax income is between $1,800.00 and $2,000.00 per month. The Debtor testified that she expects to continue to be employed as a social worker, but is unable to work more than she currently does due to physical limitations. However, the Debtor indicated that she is not a licensed social worker, a status which would allow her to seek higher paying jobs or promotions in her field. The Debtor testified that she has not become licensed because a licensed clinical social worker would have to supervise her work in order for her to obtain her license. That opportunity was not available to the Debtor at her current job over the last year.

The Debtor has resided with her now seventy-seven year old mother since August 1997. Her mother owns the home in which they live and receives income of approximately $1,700.00 per month.[2] The Debtor has no children. There was no evidence presented as to whether the Debtor claims anyone as a dependent for

---

**2.** This is comprised of $400.00 rent from the Debtor, $750.00 rental income from an apartment over a barn/garage at the home, and $550.00 from the Social Security Administration. The Debtor testified that her mother's expenses are largely made up of yearly prop-erty taxes on the home of $8,900.00, home-owners insurance of $700.00, and $1,089.00 for Medex insurance. Her mother also requires medications which cost between $75.00 and $100.00 per month.

tax purposes. Her living expenses include $400.00 rent which is paid to her mother, $80.00 for the household telephone and $110.00 for the household utilities including electricity, oil, and cable television. The Debtor testified that her mother does not contribute to the utilities. The Debtor has also accepted full responsibility for the household monthly food bill which is approximately $500.00. However, the Debtor testified that her mother is capable of paying for her own groceries. The Debtor expends approximately $200.00 per month on clothing and testified that is necessary due to a recent change in her physical appearance and her need to look professional at work, but acknowledged that it will be less as she completes the purchase of her new wardrobe. Her laundry/dry cleaning expenses amount to $30.00 monthly.

The Debtor drives a 1997 Toyota Corolla purchased for her by her mother and held in her mother's name. The loan on the vehicle is paid by the Debtor to her mother in the monthly amount of $236.76, although the Debtor rounds up and pays $250.00. There is approximately $6,000.00 left on the car loan which was a five year note taken in 1998. Although the insurance on the vehicle is in her mother's name, the Debtor pays $100.00 per month to her mother toward that bill. The Debtor also pays the excise tax on the vehicle of approximately $136.00 per year. The Debtor testified that gas and oil changes total approximately $200.00–$250.00 per month on average. The Debtor also pays storage rental fees of $85.00 per month and believes that is necessary due to a lack of space for such items at her mother's house. The Debtor's remaining monthly expenses include $20.00 per month for haircuts, $20.00 per month for gifts, entertainment costs of approximately $100.00, and charitable contributions are occasion-ally made in the approximate amount of $10.00.

The Debtor testified as to her past, current and future medical condition without objection. Her testimony was not challenged by ECMC. According to the testimony, the Debtor experienced what she characterizes as a spinal cord injury in 1993, and as a result, had to learn to walk again. She now experiences pain every day. The Debtor believes that the injury is related to a back condition resultant of extensive athletic activity. The Debtor described her pain as leg pain down the back and front of both legs and around her inner thighs. She has a nerve root problem which often makes her right leg numb. She has permanent numbness/loss of feeling behind her right thigh and calf, and no feeling in three quarters of her right foot. Long periods of sitting result in intense painful spasms from right heel to hip, and climbing stairs also proves difficult as a result of the loss of feeling in the right foot. The Debtor testified that there is a 100% chance of her personal injuries requiring future surgery. There was no evidence presented as to any disability rating.

As a result of the above described conditions the Debtor is medicated daily with Percocet, Oxycodar, Soma, Pamelor, and Ibuprofen as needed. The Debtor also takes Ritalin for Attention Deficit Disorder and an additional medication for Chronic Sinusitis. All of her prescription medications are prescribed by her physician whose office is on Cape Cod, Massachusetts. The Debtor's monthly medication/office visit co-pay bill is approximately $150.00–$200.00 per month. The Debtor's travel/auto expenses as outlined above include her monthly trips to Cape Cod to see her physician.

The Debtor's monthly student loan payments on the loans are approximately

$475.00 per month and accrue interest at approximately 8%. Since the loans became due, the Debtor has made efforts to make monthly payments, but has sought deferments at times when she became unable to pay during a period of unemployment relating to the job market and her involvement in an abusive relationship. The Debtor does maintain an additional student loan directly with Boston College, which she is paying and which she does not seek discharge of. The balance of the Boston College loan is $2,446.00. The Debtor testified that she would like to pay her student loans and has made a past effort to consolidate the loans, however, the attempt was unsuccessful. The Debtor has not made a consolidation effort in the last year insofar as such opportunity has not been offered to her.

## II. *DISCUSSION:*

The sole issue before the Court is whether the Debtor's circumstances, income, and expenditures establish that payment of her consolidated student loan would inflict undue hardship upon her such that the loan is dischargeable pursuant to 11 U.S.C. § 523(a)(8).[3] The Court applies the standard set forth in its previous decisions of *In re Dolan*, 256 B.R. 230, 238 (Bankr.D.Mass.2000) and *In re Bloch*, 257 B.R. 374, 377 (Bankr.D.Mass.2001). Within those cases this Court held that the proper standard for determining whether excepting the Debtor's student loans from discharge will cause undue hardship requires that the Debtor prove that (1) her past, present, and reasonably reliable future financial resources; (2) her and her dependents' reasonably necessary living expenses, and; (3) other relevant facts or circumstances unique to the case prevent her from paying the student loans in question while still maintaining a minimal standard of living even when aided by a discharge of other pre-petition debts. *See also Kopf v. United States Dept. of Educ. (In re Kopf)*, 245 B.R. 731, 739 (Bankr. D.Me.2000). Undue hardship does not require poverty or hopelessness. *See Kopf*, 245 B.R. at 744–45; *cf. Randall v. Norwest Student Loan Serv. (In re Randall)*, 255 B.R. 570, 577–78 (Bankr.D.N.D.2000).

In some instances this Court has found that certain debtors who felt that they were entitled to a hardship discharge of student loans did not meet the standards set forth in *Kopf*, 245 B.R. at 739, *Dolan*, 256 B.R. at 238, and *Bloch*, 257 B.R. at 377. However, this Court has also granted relief, without written decision, to other debtors who have filed complaints which met the standard set forth above, resulting in discharge of their student loan obligations. Such examples include a debtor who submitted uncontroverted evidence that she suffered severe and debilitating effects following a rape by a stranger while in college which resulted in disabilities causing her to be unable to find gainful employment sufficient to pay her student loans. A further example is a debtor who submitted uncontroverted evidence that he suffers from bipolar disorder, that his father and grandfather committed suicide due to chronic depression and that he suffers from the same symptoms which

---

3. Section 523(a)(8) of the Code states, in relevant part, that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, ... unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependants.

11 U.S.C. § 523(a)(8).

cause him to be unable to earn a living or pay his student loans. These examples describe situations in which the totality of a debtor's circumstances, as evidenced at trial, led the Court to find that a particular debtor has met the test outlined above and is entitled to discharge of her or his student loans as they amount to an undue hardship for the debtor. Not all debtors, though, evince such dramatic or clear cut circumstances, and this Court often finds itself with facts making these determinations a close call. In such cases, it may be more appropriate to consider something other than an all or nothing approach to § 523(a)(8) determinations. Such is the case here.

The legislative history of § 523(a)(8) shows a clear congressional intent to afford greater protections to student loan lenders and guarantors. For example, when Congress amended the section in 1998 as part of the Higher Education Amendments of 1998, P.L. 105–244, 112 Stat. 1581 (October 7, 1998), it clearly sought to curb what was an apparent abuse of the student loan financing program by eliminating unconditional discharges of student loans due and payable longer than 7 years, leaving only the more stringent "undue hardship" standard to obtain discharge of those debts. *See White v. U.S. Dept. of Ed. (In re White)*, 243 B.R. 498, 505 n. 5 (Bankr.N.D.Ala.1999); *Kahl v. Tex. Higher Educ. Coordinating Bd., et al.*, 240 B.R. 524, 529 n. 7 (Bankr.E.D.Pa. 1999). Additionally, the legislative comments reveal Congress chose not to implement procedural devices in favor of debtors, rather intending that the exception be self-executing, alleviating student loan creditors of the need to take affirmative action to determine the dischargeability of the debt. Notes of Committee on the Judiciary, Senate Report No. 95–989, U.S.Code Cong. & Admin.News 1978, p. 5787. In the wake of this amendment, the

Code was left with a statute that was intended to prevent use of the Bankruptcy Courts to abuse the student loan programs and further to preserve the solvency of those programs to insure their longevity for future generations of students. *See Andresen v. Neb. Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 130 (8th Cir. BAP 1999); *Great Lakes Higher Ed. Corp. and Hemar Ins. Corp. v. Brown (In re Brown)*, 239 B.R. 204, 210 (S.D.Cal. 1999). This clear Congressional initiative of amending § 523(a)(8), though, is merely another brush stroke across the legislative canvas that is the Bankruptcy Code. Thus, that stroke must be viewed as part of the overall picture, and not the main focus, if we are to discern the true picture. As such, the policies and objectives behind § 523(a)(8) must be considered, as should any accession, as an operative part of the policies and objectives of the Code *en toto*.

It is plain that the impetus of allowing a debtor a discharge in bankruptcy is to afford that debtor a financial "fresh start." *See Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Bank of Boston v. Burr*, 160 F.3d 843, 847 (1st Cir.1998). Another central goal of the Code is to provide economic stabilization, even if only temporarily, to give debtors the financial breathing room they need to reestablish what might be a viable going concern. *See e.g., In re Foxridge Ltd. P'ship*, 238 B.R. 810, 819 (Bankr.W.D.Mo.1999); *LTV Corp., et al. v. Back, et al. (In re Chateaugay Corp.)*, 201 B.R. 48, 72 (Bankr. S.D.N.Y.1996); *In re 801 South Wells St. Ltd. P'ship*, 192 B.R. 718, 725 (Bankr. N.D.Ill.1996). All of these goals favor an inference that, barring abuse of the bankruptcy courts and the Code, all debtors deserve at least a chance at a fresh start. This assertion is further supported by the notion that it is now axiomatic, at least in

this circuit, that discharge for the debtor, absent debtor abuse, should be the norm, and that exceptions to that rule, e.g., § 523(a)(8), should be narrowly construed with all doubts resolved in favor of the debtor. *See e.g., Martin v. Bajgar,* 104 F.3d 495, 498 (1st Cir.1997); *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir. 1997); *Century 21 Balfour Real Estate v. Menna,* 16 F.3d 7, 9 (1st Cir.1994).

In light of what appear to be competing objectives of § 523(a)(8) and the Code generally, this Court sees the issue of whether § 523(a)(8) allows for partial discharge of student loan debts as a question that turns on the *degree* of hardship repaying the student loans will cause the debtor and the debtor's dependents. *See Andresen,* 232 B.R. at 133 (*citing Heckathorn v. United States Dept. of Educ. (In re Heckathorn),* 199 B.R. 188, 194 (Bankr.N.D.Okla.1996)). In this case ECMC has invited consideration of partial discharge if the Court were not inclined to deem all of the Debtor's loans non-dischargeable, and the Debtor indicated a willingness or ability to pay something toward her student loan debt to ECMC.

Other courts have been confronted with similar factual scenarios. For example, the Ninth Circuit Bankruptcy Appellate Panel addressed this issue when another bankruptcy court granted a debtor a partial discharge of student loans by reconfiguring the debtor's payment schedule resulting in a discharge of approximately 70% of the debtor's student loan obligations. *United Student Aid Funds, Inc. v. Taylor (In re Taylor),* 223 B.R. 747, 750 (9th Cir. BAP 1998). There, in making its determination that the bankruptcy court erred in granting partial discharge, the panel turned to the language of § 523(a)(8), focusing on the absence of the limiting phrase "to the extent" that is found in other sub-sections of § 523(a).

*Id.* at 753. Observing that Congress could have limited § 523(a)(8) in that manner, the panel concluded that a plain reading of the section mandated a contrary result. *Id.*

Other courts have found this omission inconsequential, and arrive at a different result. The *Brown* court, for example, undertook an analysis of § 523(a)(8), expressly taking into account the issues raised by the *Taylor* panel. *Brown,* 239 B.R. at 210–11. That court found the limiting language included in other sub-sections of § 523(a) served to identify the *type* of debt encompassed by the sub-section, thereby implicating issues of definition, but not controlling the quantitative issues regarding the debt implicated. *Id.* at 211. Deciding it was not confined by the omission identified in *Taylor,* the *Brown* court went on to address the dichotomy of policies between the Code *en masse* and § 523(a)(8). Noting both policy objectives could be served by allowing partial discharges, i.e., preservation of student loan program solvency and affording the debtor a "fresh start," that court held that § 523(a)(8), in combination with the equity powers conferred under § 105(a) of the Code, does in fact allow a partial discharge when insufficient hardship exists to warrant full discharge, but undue hardship would result from denial of that relief. *Brown,* 239 B.R. at 211–12.

This Court shares the concerns of other courts that an all or nothing approach to deciding § 523(a)(8) matters is too harsh—too harsh on debtors, on student loan creditors, and on the "fresh start" principles of the Code—to *not* adopt a partial discharge approach under § 523(a)(8). This Court finds the *Brown* court's approach of reforming a debtor's student loans to meet their ability to pay attractive, but disagrees that it has such authority. This Court reads the statute to

mandate consideration of each student loan individually to determine whether repayment of it will impose undue hardship on the debtor(s). In so holding, the Court relies specifically on *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 130 (8th Cir. BAP 1999). The *Andresen* Bankruptcy Appellate Panel held that the trial court applied 11 U.S.C. § 523(a)(8) to each individual student loan owed by the debtor, and not to the debtor's aggregate student loan debts for which she sought discharge. *Andresen*, 232 B.R. at 137. The panel there held that although they found no statutory authority in the Bankruptcy Code for true "partial" discharge, the trial court's application of the statute to each individual student loan one at a time was not clear error, but rather that it is required by the language of the statute. *Andresen*, 232 B.R. at 137. Therefore, this Court holds that the proper analysis is not a true "partial" discharge in the sense of splitting a single or aggregate loans into dischargeable and non-dischargeable parts, but instead to apply the prevailing undue hardship test used by this Court to each individual loan to determine whether a hardship exists for the debtor to pay such loan. A reasonable starting point is with the oldest loan forward. The result may very well be considered a "partial" discharge in that the debtor may no longer owe certain of her loans, but no loan will be parsed.

■ In the case at hand the Court finds that the Debtor has some ability to pay her student loans, but that it would cause her undue hardship to pay all of her student loans collectively. The Debtor's expenses appear to be reasonable. Although the Debtor lives comfortably, she does reside with her mother, and affords little social life. Furthermore, the Court has no reason to doubt her testimony as to physi-

cal limitations, resultant pain, and medical costs. Likewise, the Court accepted her testimony as to the number of hours she is capable of working, as well as the income she is able to derive therefrom. The Court was not presented with defense rebuttal evidence other than limited cross examination of the Debtor on the witness stand. There is no evidence before the Court that ECMC deposed the Debtor or her mother, that ECMC attempted to obtain copies of any checks the Debtor claims to pay to her mother, or that ECMC attempted to obtain and/or verify the Debtor's testimony with regard to her medical condition and prognosis. Furthermore, ECMC did not question the Debtor in depth with regard to her efforts, or lack thereof, to become licensed in her field. On the record before the Court, I find the Debtor credible and have virtually no contradictory evidence with which to balance her snapshot of her financial affairs.

In assessing all of the information that is before the Court concerning the Debtor's financial ability, I find that: (1) her past, present, and reasonably reliable future financial resources; (2) her reasonably necessary living expenses, and; (3) her medical condition prevent her from paying more than her first student loan while still maintaining a minimal standard of living even when aided by a discharge of other pre-petition debts. Accordingly, I find that the Debtor can make payments on the first student loan she entered into with ECMC's predecessor, but that she does not have the financial where-with-all to repay the remaining three loans.

### III. *CONCLUSION:*

For all of the foregoing reasons the Debtor's indebtedness to the Defendant, ECMC, for loan # 1 taken in July 1991, which is found to have an exact, present balance of $9,317.83, is hereby deemed

nondischargeable as the Court finds that payment of that loan will not cause the Debtor, or any dependant of the Debtor, an undue hardship. The balances of the Debtor's indebtedness to the Defendant ECMC for loans # 2, # 3, and # 4 are hereby deemed dischargeable as the Debtor has satisfied her burden of showing undue hardship under § 523(a)(8) of the United States Bankruptcy Code, and the Defendant, ECMC, has not presented contrary evidence. As to the Counterclaim raised by ECMC, the Court finds for the Plaintiff on the issue of attorneys fees and costs as ECMC introduced no evidence to support those claims. The Court hereby abstains from entering judgment as requested in the Counterclaim.

IT IS SO ORDERED.