**In re Minoo GHARAVI, Debtor.**

**Minoo Gharavi, Plaintiff,**

v.

**U.S. Dept. of Education and Educational Credit Management Corporation, Defendants.**

**Bankruptcy No. 03–12600WCH.
Adversary No. 03–01180.**

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

Jan. 10, 2006.

494

Joel Jay Rogge, Antonucci & DiGiam-marino, Ipswich, MA, for Debtor/Plaintiff.

## MEMORANDUM OF DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. *Introduction*

Plaintiff Minoo Gharavi (the "Debtor") filed an adversary proceeding seeking the discharge of her student loans pursuant to 11 U.S.C. § 523(a)(8), which allows the discharge of student loans if their repayment would impose an undue hardship on a debtor. Educational Credit Management Corporation ("ECMC") and the United States Department of Education ("US-DOE") defend the complaint by arguing that the Debtor has resources to pay the obligation. I held an evidentiary hearing and took the matter under advisement. For the reasons set out below, I will enter judgment for the Debtor in part.

### II. *Facts*

In 1987, the Debtor graduated from Texas Southern University with a Bachelor of Science degree in architecture.[1] For

---

1. Plaintiff's Answers to Interrogatories Propounded by Educational Credit Management Corporation, Plaintiff's Trial Exhibit 2 (the "Interrogatory Answers"), Answer to no. 12;

the next several years she worked in the architecture and design fields.[2] Amid job uncertainty in the field of architecture, however, the Debtor decided to go back to school to study to become an optometrist.[3] The Debtor elected to attend the New England College of Optometry and in 1993 enrolled in a four year program which was to lead to the degree of Optometry Doctorate ("O.D.").[4]

At the start of the 1995–1996 school year, the Debtor lost sight in her left eye due to optic neuritis.[5] She requested and was allowed a leave of absence to attempt to remedy her ailment, which she did, and returned to school.[6] In the early stages of the 1996–1997 school year, the Debtor was diagnosed with Graves Disease which resulted in a hyper-active thyroid. The symptoms of the disease forced the debtor to withdraw from school again.[7] The Debtor sought medical help and was able to successfully treat her Graves Disease.[8] She reentered school in the fall of 1997.[9]

The Debtor's condition soon worsened again. As part of her treatment she took medication that suppressed her thyroid function, which made it difficult for her to concentrate and impeded her memory.[10] According to the Debtor, these problems caused her to fail two out of six final exams during the fall of 1997, and she was dismissed from school.[11] Thereafter, the Debtor sought further medical attention. That treatment resulted in the destruction of her thyroid and restored her to normal function, thereby negating the effect of her Graves Disease.[12] According to the Debtor, she did not apply to optometry schools again because she was concerned that her health would keep her from getting a degree and she did not want to take on additional student loan debt in the face of such uncertainty.[13]

After she left school, the Debtor was able to find employment as an Optometric Technician and subsequently as an Opthalmic Technician, the job she now holds.[14] The Debtor earned $17.75 per hour in 2002 when she started at her present position with the New England Eye Center at St. Elizabeth's Medical Center in Brighton, Massachusetts. She now earns a wage of $19.75 per hour, due to yearly raises which she characterizes as cost of living raises.[15] She works approxi-

---

Trial Transcript ("Tr."), p. 7. The Interrogatory Answers were introduced into evidence without objection. Tr. at p. 3–4.

2. Tr. p. 8.

3. Tr. p. 8–9.

4. *Id.*

5. Tr. p. 10.; Interrogatory Answers, Answer to no. 12 (adopting paragraphs 9–18 of the Plaintiff's Complaint).

6. Tr. p. 13; Interrogatory Answers, Answer to no. 12 (adopting paragraphs 9–18 of the Plaintiff's Complaint).

7. Tr. p. 13; Interrogatory Answers, Answer to no. 12 (adopting paragraphs 9–18 of the Plaintiff's Complaint).

8. Interrogatory Answers, Answer to no. 12 (adopting paragraphs 9–18 of the Plaintiff's Complaint).

9. *Id.*

10. *Id.*

11. Tr. p. 14; Interrogatory Answers, Answer to no. 12 (adopting paragraphs 9–18 of the Plaintiff's Complaint).

12. Interrogatory Answers, Answer to no. 12 (adopting paragraphs 9–18 of the Plaintiff's Complaint).; Tr. p. 12.

13. Tr. p. 30.

14. Tr. p. 7.

15. Interrogatory Answers, Answer to no. 3; Tr. p. 25.

mately 40 hours each week and does not hold a second job.

In 2002, the Debtor was diagnosed as suffering from multiple sclerosis.[16] According to the Debtor, symptoms of her multiple sclerosis include memory loss, difficulty concentrating, and fatigue.[17] At his deposition, Dr. Howard L. Weiner, the Debtor's neurologist, testified that the Debtor had experienced symptoms of multiple sclerosis including bladder problems, fatigue, and spasms.[18] Using the Kurtzke Expanded Disability Status Scale, commonly used to describe the degree to which multiple sclerosis has disabled a person, Dr. Weiner stated that the Debtor was about a 2.5 on the scale, representing minimal disability in two functional systems.[19] He stated that the Debtor uses four medications, one to treat her multiple sclerosis, and three to treat its symptoms, specifically fatigue, spasms, and bladder problems.[20] Dr. Weiner stated that he was not certain about whether or how the Debtor's condition would change as it progressed.[21]

During her studies at the New England School of Optometry, the Debtor relied heavily on student loans. At the time of trial she owed $63,628.01 on four loans held by ECMC[22] The Debtor has made no payments on the loans held by either of the defendants. According to the Debtor, however, she has made monthly payments of $88.21 on two Health Education Assistance Loans (the "HEALs") that totaled $11,234.41 at the time this adversary proceeding was initiated, and she is not seeking a discharge of the HEALs.[23]

The Debtor filed for protection under Chapter 7 of the Bankruptcy Code on April 1, 2003. She subsequently commenced this adversary proceeding by filing the Complaint to Determine Dischargeability of Student Loan (the "Complaint") against the USDOE, the New England College of Optometry, and Sallie Mae Servicing, Inc. ECMC, the successor to the loans originally issued by Sallie Mae, was substituted into this action.[24] A default judgment was entered against the New England College of Optometry due to its non response.[25] I held a trial on the matter on September 28, 2005. The Debtor was the sole witness and 22 exhibits, including the deposition transcript of Dr. Weiner, were entered into evidence without objection.[26]

### III. *Analysis*

 Under 11 U.S.C. § 523(a)(8), a debtor can have an otherwise nondischargeable educational debt discharged if its repayment would impose an undue hardship on the debtor or the debtor's dependents.[27] The burden is on the Debt-

---

16. Tr. p. 15–16.

17. *Id.* at 16.

18. Weiner Dep. at 7.

19. *Id.* at 20, App. D.

20. Tr. at 7.

21. Weiner Dep. at 13.

22. Defendant's Trial Exhibit D–2–1.

23. Complaint p. 6, Docket no. 1; *See* Stipulation Between Minoo Gharavi and the United States of America, Docket no. 9.

24. Endorsed Order granting Motion by Education Credit Management Corporation to be Substituted for Defendant, Sallie Mae Servicing, Inc., Docket no. 12.

25. Endorsed Order granting the Debtor's Motion for a Default Judgment Against New England College of Optometry, Docket no. 25.

26. Tr. p. 3–4.

27. 11 U.S.C. § 523(a)(8) states, in relevant part, as follows:

A discharge under section 727 ... of this title does not discharge an individual debtor

or to prove by a preponderance of the evidence that repayment would impose an undue hardship. *Anelli v. Sallie Mae Serv. Corp., et al. (In re Anelli)*, 262 B.R. 1, 7 (Bankr.D.Mass.2000). In determining whether an undue hardship would be imposed by repayment, courts have used several tests, including the *Brunner* test and the "totality of circumstances" test.[28] As I explained at trial, I employ the totality of circumstances test to evaluate undue hardship claims, as outlined by Judge Haines in *In re Kopf*.[29] That test calls for the examination of the Debtor's past, present, and likely future income and reasonably necessary living expenses, as well as other relevant circumstances, to determine whether the Debtor is capable of earning enough to sustain herself and her dependents while repaying her educational debt.[30]

▮ The crux of the Debtor's argument is that she will never be able to earn substantially more than she earns now due to her multiple sclerosis. She also argues that her present income affords her barely enough to pay her relatively modest expenses. The Defendants counter that the Debtor has not demonstrated that she can not advance further in her career or that she is unable to work a second job. They also argue that her expenses, notably her automobile-related expense and her cigarette expense, are unreasonable and consume money that could be put towards her student loans.

Regarding the Debtor's prospects for higher future earnings, the Debtor admitted at trial that she had expended little effort in trying to find a better job in the vision health field.[31] She stated that based on what she knows from her own experience in the field and from what her colleagues have told her, she cannot get a better position with her training and experience.[32] As to further training and education, the Debtor said that she was unfit both physically and financially to go back to school to complete her O.D.[33] The Debtor also stated that she had contemplated going back to work in architecture but that she had not found better opportunities in that field than in the area of vision health because of her lengthy absence from architecture.[34]

The Debtor also admitted at trial that she rarely works overtime and that she does not hold, and has not sought, a second job.[35] As to overtime, the Debtor stated that it was not up to her not to work overtime since it was her employer's decision not to give out much if any over-

---

from any debt ... for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor or the debtor's dependents
....

**28.** *Kopf v. United States Dep't of Educ. (In re Kopf)*, 245 B.R. 731, 736–741 (Bankr.D.Me. 2000) (citing *Brunner v. New York State Higher Educ. Serv. Corp. (In re Brunner)*, 46 B.R. 752, 754–55 (S.D.N.Y.1985)).

**29.** *Id.* at 758–59. Recently, Judge Boroff offered a comprehensive and compelling argument for the employment of the totality of circumstances test in *Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18 (Bankr.D.Mass.2005).

**30.** *Id.* at 24.

**31.** Tr. p. 32.

**32.** *Id.* at 33–34, 49–50.

**33.** *Id.* at 30–31.

**34.** *Id.* at 18.

**35.** *Id.* at 18–19, 21.

time to its employees.[36] Concerning a second job, the Debtor stated that just working her present job for 40 hours each week leaves her exhausted and that she would be physically incapable of working a second job.[37] According to the deposition transcript of Dr. Weiner, fatigue is a common symptom of multiple sclerosis and the Debtor takes medication meant to reduce her fatigue.[38]

I found the Debtor's testimony at trial that she was unable to work a second job because of her fatigue credible. I also found convincing her assertion that she is not able to go back to school. The Debtor's claim that she cannot go back to work in the field of architecture is also credible.

No one can know whether the Debtor's multiple sclerosis, and the symptoms she experiences as a result of it, will worsen considerably in the future. Dr. Weiner testified in his deposition that the Debtor's condition had worsened somewhat since the he began treating her.[39] He stated that she now exhibited more symptoms, including tiring more quickly, than she had when he first treated her.[40] Dr. Weiner also testified that, although it is not inevitable that the Debtor will eventually become disabled because of multiple sclerosis, there is a high likelihood that she will.[41] Dr. Weiner stated that the majority of people with multiple sclerosis have their life altered by the disease, becoming unable to work, raise their families, and live a normal life.[42] Regarding the effects of the medications the Debtor takes to treat her multiple sclerosis and its symptoms, Dr. Weiner stated that the drugs were partially effective at reducing the frequency and severity of multiple sclerosis relapses.[43] Based upon his testimony, I conclude that it is highly improbable that the Debtor's condition will ever improve, and fairly unlikely that it will stay as it is now. Rather, her condition will probably worsen, making it more and more difficult for her to work. Accordingly, the Debtor's ability to repay her student loans will only worsen.

The defendants argue that it is possible that advances in treating multiple sclerosis might eventually allow its effects to be reversed and perhaps eliminated. According to the deposition testimony of Dr. Weiner, however, although such developments are possible, they are far from certain.[44]

As to the Debtor's Graves Disease, the Debtor agreed that its affects have been eliminated.[45] Accordingly, her affliction with Graves Disease is not a basis on which I can grant the Debtor relief.

Having found that the Debtor cannot earn substantially more than she presently earns, I must consider whether her expenses are reasonably necessary, or whether they can be reduced to provide more money with which to pay off her student loans. The defendants object to three of the Debtor's expenses: her $175.00 monthly cigarette expense, her $366.96 monthly expense for car maintenance, insurance, and operation, and her $1,400 monthly expense for rent.

36. *Id.* at 21.

37. *Id.* at 17–19

38. Weiner Dep. p. 7.

39. *Id.* at 6–7.

40. *Id.* at 7, 10.

41. *Id.* at 13.

42. *Id.* at 15.

43. *Id.* at 16.

44. Tr. p. 16–18, 21.

45. *See id.* at 27.

■ The cigarette expense includes money used to buy cigarettes for the Debtor's mother, who lives with the Debtor and whose social security benefits supplement the Debtor's income.[46] In the continuation sheet attached to her amended Schedule J, the Debtor discloses that she and her mother smoke about 35 packs of cigarettes between them each month.[47] At trial, the Debtor stated that she had attempted to quit smoking, unsuccessfully.[48] She also stated that she believed she was entitled to smoke, as it was her only source of relaxation.[49]

Many courts have examined the reasonableness and necessity of cigarette expenses in the course of an undue hardship analysis or the similar analysis of whether a Chapter 13 debtor's expenditures are reasonable and necessary or whether a debtor's expenditures for cigarettes suggest that the debtor's filing is a substantial abuse. *See, e.g., In re Hornsby,* 144 F.3d 433, 438 (6th Cir.1998); *Sarasota Inc. v. Weaver,* 2004 WL 2514290 (E.D.Pa. Nov.5, 2004); *Waites v. Braley,* 110 B.R. 211 (E.D.Va.1990); *In re Lowe,* 321 B.R. 852, 858 (Bankr.N.D.Ohio 2004); *In re Woodman,* 287 B.R. 589, 592–97 (Bankr.D.Me. 2003); *In re Clark,* 273 B.R. 207 (Bankr. N.D.Iowa 2002); *In re Webster,* 2002 WL 32700045 (Bankr.D.Kan.2002); *In re Regan,* 269 B.R. 693, 698 (Bankr.W.D.Mo. 2001); *In re Williams,* 233 B.R. 423, 429 (Bankr.W.D.Mo.1999); *In re Buntin,* 161 B.R. 466 (Bankr.W.D.Mo.1993). The issue of the reasonableness and necessity of cigarette expenses is often addressed without much discussion. *See, e.g., In re Williams,* 233 B.R. 423, 429 (Bankr.W.D.Mo.1999).

In *In re Woodman,* Judge Haines spoke about cigarette expenses in some detail. He held that to prohibit such expenses as per se unreasonable would be foolish and that the better course would be to "scrutinize the debtor's budget in view of the particular circumstances." *In re Woodman,* 287 B.R. at 596. Judge Haines ultimately found that, given the debtor's otherwise modest expenditures which included no allotment for "vacations, retirement, savings, or charity," the cigarette expense was not unreasonable or unnecessary. *Id.* at 596–597. This is the approach typically taken. I found no cases holding that cigarette expenses are per se unreasonable and several, including *In re Woodman,* that reject such a holding. *Id.; See also Sarasota, Inc. v. Weaver,* 2004 WL 2514290, *5 (E.D.Pa.2004).

A number of cases have held that the amount of cigarette expenditures is excessive and have reduced the amount. *See, e.g., In re Webster,* 2002 WL 32700045 (Bankr.D.Kan.2002) (holding that $250 was unreasonable and limiting the debtor to $100 per month in cigarette expenses); *In re Buntin,* 161 B.R. 466, 468 (Bankr. W.D.Mo.1993) ("While I will not find that debtors must stop smoking in order to avail themselves of bankruptcy relief, I will find that an expense in excess of a pack of cigarettes per day per debtor is not necessary or reasonable."). Some courts, however, have used the fact of a debtor's cigarette use as part of the evidence that the debtor has sufficient discretionary income to pay their student loans, so that excepting the loans from discharge would not pose an undue hardship. *See, e.g., In re Clark,* 273 B.R. at 210–211.

I adopt Judge Haines' reasoning in *Woodman,* and because the circumstances

---

**46.** Tr. p. 19–20, 52.

**47.** Amended Schedule J, Case no. 03–12600, Docket no. 17.

**48.** Tr. p. 35–36.

**49.** *Id.*

of the Debtor are similar to those of the debtor in *Woodman*, I hold that the Debtor's smoking expense of $175.00 is reasonable. I do not have the authority to order the Debtor to cease smoking or to reduce her use of cigarettes under the circumstances of this case.

■ The defendants assert that the $360.96 the Debtor claims in monthly transportation expenses should instead be used to pay her student loans. In support of this assertion, the defendants point to the Debtor's admission that she does not actually own a car.[50] This is the extent of the defendants' argument. In the Debtor's amendment to Schedule J, she stated that of her transportation expense, about $25 per month goes to parking at her workplace, $200 goes to pay for gas, and about $30 goes to maintenance.[51] The Debtor also pays $94.08 each month for car insurance.[52] The insurance certificates which the Debtor submitted show that her ex-husband is the owner of the car she uses.[53] Here, the owner of the car is not relevant, because the expense to operate and maintain it is reasonable.

■ The defendants also object to the cost of the apartment that the Debtor lives in with her mother. The USDOE argued in its post-trial brief that the Debtor should find an apartment closer to where she works in Brighton, and should look in areas less expensive than her current area, Newton. The Debtor counters that her apartment is close to her job, she lives in the apartment with her mother, and she wants to live in a safe neighborhood.[54] I find that the rental expense is neither unreasonable nor unnecessary as Newton is quite close to Brighton and the Debtor is in need of a large apartment since she lives with her dependent mother.

■ The Defendants additionally contend that including the Debtor's tax refund, this year in the amount of $2,123.00, gives the Debtor additional monthly income of $176.92. Even allowing all of the Debtor's claimed expenses, this results in a monthly surplus of $109.91. Tax refunds, however, vary from year to year and I will not assume that the Debtor's tax refund will always be so generous. The Debtor's tax refund of $1.521.00 for tax year 2003 was 28.4% lower than her $2,123.00 refund for tax year 2004, even though her taxable income of $37.023.99 for tax year 2003 was only 7.3% lower than her taxable income of $39,931.99 for tax year 2004. To attempt to account for the inevitable variation of the Debtor's future tax refunds, I will count as additional monthly income $129.30, which is the average of the Debtor's refunds for tax years 2002, 2003, and 2004 spread over 12 months.[55] Reducing the amount of the Debtor's monthly income attributable to tax refunds by $47.62 results in a monthly surplus of $62.29.

■ Finally, the Defendants argued that the $88.21 that the Debtor pays each month towards her Health Education Assistance Loans (the "HEALs") could go to pay off the other student loans once the HEAL payments end. Even if interest has not been accumulating on the $11,234.41 that the Debtor owed at the time of filing in April of 2003, however, that amount would only have diminished by $2822.72 (32 months × $88.21), and will

50. *Id.* at 34.

51. Amended Schedule J, Case no. 03–12600, Docket no. 17.

52. *Id.*

53. Debtor's Ex. 19.

54. Tr. p. 33.

55. Debtor's Ex. 2, 3, 10, 11.

take approximately 8 years ($8411.69 / $88.21 = 95.3) to repay. I will not, therefore, count the amount of the Debtor's monthly HEAL payment toward the amount available to the Debtor to repay the student loans held by the Defendants.

The Defendants provided various payment schedules along with their post-trial briefs.[56] The most forgiving of these schedules would require the Debtor to pay $419.50 each month.[57] The Debtor cannot now, and likely will not ever, be able to afford this payment, given her surplus of $62.29. Repaying each of her student loans would therefore work an undue hardship upon her. The Debtor does, however, have some ability to repay part of her debt. The Defendants argue that even if the repayment of all of her debts would cause the Debtor to suffer an undue hardship, the Court does have the power to discharge some of the Debtor's student loans while leaving others intact.

Other courts addressing the issue of whether a bankruptcy court has the power to enter a partial discharge have reached three contrary conclusions. In *United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747 (9th Cir. BAP 1998), the court held that the Code does not vest bankruptcy courts with the authority to grant a partial discharge at all. In *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 130 (8th Cir. BAP 1999), the court held that it was permissible to consider each individual loan separately and discharge those that the debtor could not pay without undue hardship, but found no authority to modify individual student loans beyond deciding whether to discharge them. In *Great Lakes Higher Ed. Corp. and Hemar Ins.*

*Corp. v. Brown (In re Brown)*, 239 B.R. 204, 210–212 (S.D.Cal.1999), the district court held that a bankruptcy court could alter the provisions of a debtor's student loans to accommodate the debtor's limited ability to pay.

■■■ Judge Rosenthal reviewed these positions in *In re Coutts* and held that a partial discharge could be granted but that the court could only chose between discharging or not discharging each of the debtor's individual loans and was without power to alter the terms of the loans. *Coutts v. Mass. Higher Educ. Corp. (In re Coutts)*, 263 B.R. 394 (Bankr.D.Mass.2001). Judge Rosenthal determined that the best way to determine which loans could be discharged would be to begin with the oldest loans, preserving them at the expense of newer loans. I adopt the reasoning and the holding of *Coutts*.

Among the schedules provided by defendant ECMC in its post-trial brief was a table of payment amounts due under various loan repayment time-frames for each of its four student loans.[58] Two of these ECMC loans, the loan number one and loan number four, were extended on November 17, 2003, and are the earliest loans on record. The USDOE did not provide information on its individual loans. With a repayment period of 25 years, monthly payments on ECMC loan number one, which presently has a balance of $9,750.40, would be $63.42, and monthly payments on the ECMC loan number four, which has a balance of $22,897.57, would be $148.93. The Debtor only has enough surplus income to afford payments on ECMC loan number one. I will therefore discharge all of the USDOE's loans and all of ECMC's loans except loan number one.

**56.** *See, e.g.,* Defendant's Trial Exhibit D–2–1.

**57.** *Id.*

**58.** Post–Trial Memorandum of the Defendant, Educational Credit Management Corporation, Ex. 1, Docket no. 66.

## IV. *Conclusion*

For the reasons set forth herein, I will enter an order granting the Debtor the relief requested in her complaint in part.